**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- X

HUWE BURTON,

                              Plaintiff,

      -against-

The CITY OF NEW YORK; New York City Police Department ("NYPD") Detective Sergeant FRANK VIGGIANO (Shield No. 2877); NYPD Detective STANLEY SCHIFFMAN (Shield No. 3722); NYPD Detective SEVELIE JONES (Shield No, 1808); NYPD Detective DONALD SCHAPPERT (Shield No. 2841); Detective EUGENE MALONEY (Shield No. 1063); Detective BADE; Bronx County Assistant District Attorney ELISA KOENDERMAN; in their individual and official capacities; and STACEY BLOCKER a/k/a STACEY GREEN,

                              Defendants.

-------------------------------------------------------------------- X

                                      **COMPLAINT**

                                      **JURY TRIAL DEMANDED**

Plaintiff Huwe Burton ("Plaintiff" or "Huwe"), by his attorneys, Beldock Levine & Hoffman LLP, as and for his complaint against the Defendants alleges as follows:

**PRELIMINARY STATEMENT**

1.      This is a civil rights action brought by Plaintiff Huwe Burton who spent almost twenty years wrongfully imprisoned and over eight years on parole for the murder of his own mother, Keziah Burton; a crime he did not commit.

2.      Mr. Burton asserts claims against the City of New York ("City") based on and arising out of the wrongful acts and omissions of the New York City Police Department ("Police Department" and "NYPD") and the Bronx County District Attorney's Office ("Bronx DA's Office") and certain of the employees and agents of these offices, and against named individual

employees and agents of these offices, seeking relief for the violation of their rights secured by 42 U.S.C. § 1983 of his rights secured by the Fourth and Fourteenth Amendments to the United States Constitution.

3.      An extensive re-investigation of Huwe's conviction by attorneys from the Northwestern University's Pritzker School of Law and Rutgers Law School, later joined by the Innocence Project and the Bronx DA's Office Conviction Integrity Unit ("CIU"), led to the unanimous finding that Huwe has always been innocent.

4.      The release of information previously wrongfully withheld by the Bronx DA's Office establishes that the only evidence linking Huwe to the murder of his mother—written and videotaped statements in which he "confessed" to her murder—were untrue and coerced by New York City Police Department ("NYPD") detectives who had a demonstrable history of forcing false confessions. Additional evidence known to police and prosecutors, and withheld from Huwe and his defense counsel, further establishes that Huwe was at school at the time of the murder and that the actual murderer of Keziah Burton was Emanuel Green—a tenant with a violent criminal history and psychiatric diagnoses who moved into the apartment below the Burton family with his common law wife, Defendant Stacey Green, one month before the murder. Emanuel, who had a criminal record that included rape and robbery, and who was on parole at the time of the murder of Mrs. Burton, was caught driving Mrs. Burton's stolen car one week after her murder.

5.      The the late Emanuel Green and his wife Defendant Stacey Green then conspired with the NYPD detectives to create a false narrative implicating Huwe in order to protect themselves. The NYPD detectives conspired with the Greens so as not to undermine the detectives original coerced confession that purported to establish that Huwe Burton was responsible for his mother's death.

6.     This miscarriage of justice was the direct result of egregious misconduct by the NYPD detectives who investigated Keziah Burton's murder and the prosecution that covered up the detectives' misconduct and persisted in a malicious prosecution.

7.     The record-setting violence and chaos of the Bronx, New York, in the late 1980s fostered a culture of misconduct in the 47th Precinct of the NYPD, which investigated Mrs. Burton's murder, and the Bronx DA's Office, which maliciously prosecuted Huwe. Confronted with an escalating number of homicides and a drug trade spiraling out of control, 47th Precinct detectives hastily closed cases, often using illegal investigatory tactics. More interested in securing indictments than protecting the rights of defendants or in achieving justice, the Bronx DA's Office either participated in, covered up or turned a blind eye to such police misconduct.

8.     The investigation into the murder of Keziah Burton by the 47th Precinct and Bronx DA's Office is a textbook example of governmental misconduct. After unreasonably identifying Huwe as a suspect, detectives used improper tactics to induce Huwe to falsely confess to his mother's murder. Huwe's alleged "confession" included statements that were patently false— undoubtedly the product of improper interrogation techniques. Detectives used techniques such as coercion, isolation, manipulation, suggestion, deceit, false promises, sleep deprivation and the fact that a young Huwe Burton was traumatized from having so recently discovered the body of his mother who was victimized by two stab wounds to her neck, to actively induce the "confession."

9.     Records withheld from Huwe and his defense attorney prove that the very same detectives who coerced a false "confession" from Huwe had, only three months earlier, similarly coerced demonstrably false "confessions" from two other young men, Dennis Coss and Kelvin Parker, and caused them to be maliciously prosecuted for a murder with which they had no involvement.

10.     Other previously undisclosed records show that, shortly after coercing Huwe's false "confession," detectives received evidence that Huwe's "confession" was false. The evidence also pointed to Emanuel Green as the actual murderer of Keziah Burton. However, having gained notoriety in the press from their arrest of Huwe, these detectives, and the Assistant District Attorney, Defendant Elisa Koenderman, improperly suppressed this evidence to cover-up the detectives' egregious misconduct.

11.     During the post-conviction re-investigation of Huwe's case, new evidence came to light, including: evidence that the detectives used psychologically coercive techniques to obtain Huwe's false written and videotaped "confessions"; that the same detectives who procured Huwe's false "confessions" used the same coercive techniques to obtain false "confessions" from Coss and Parker barely three months earlier; and that evidence that exculpated Huwe and inculpated the obvious murderer, Emanuel Green, as well as his wife, Defendant Stacey Green, was withheld from Huwe and his attorney by detectives and the prosecution in violation of their *Brady* obligations.

12.     As a result of the joint re-investigation of Huwe's case conducted by Burton's legal team and the Bronx DA's Office CIU, the CIU recommended that the trial court vacate Huwe's conviction and dismiss all charges against him on January 22, 2019. On January 24, 2019, the Innocence Project moved to vacate the conviction and dismiss the indictment and on that date the Honorable Steven Barrett of the Bronx Supreme Court granted the motion and vacated that conviction and dismissed the indictment pursuant to C.P.L. § 440.10(1)(g) and (h).

13.     In total, Huwe spent approximately nineteen years, ten months, and ten days in prison and jail as a result of being wrongfully arrested for and convicted of the murder of his own mother. Of that time, Huwe spent approximately two years, four months, and five days on Rikers

Island, seventeen years, six months, and nine days incarcerated in New York state custody, as well as eight years and twenty-five days, on parole under New York state supervision—all for a crime he did not commit.

14.     Huwe now seeks to hold the Defendants liable for the wrongs he grievously suffered; for the nearly 20 years imprisoned or on parole, and for the emotional distress he continues to suffer to this day.

## JURISDICTION

15.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343(a)(3) and (a)(4), as this action seeks redress for the violation of Plaintiff's constitutional and civil rights.

## VENUE

16.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2), as this is the judicial district in which the events giving rise to Plaintiff's claims took place.

## JURY DEMAND

17.     Plaintiff demands a trial by jury in this action on each and every one of his claims for which a jury trial is legally available.

## PARTIES

18.     Plaintiff Huwe Burton is a citizen of the United States and the State of New Jersey. At all times relevant to this complaint, Mr. Burton was a resident of the State of New York, City of New York, and Bronx County.

19.     Defendant the City of New York ("the City") is a municipal entity created and authorized under the laws of the State of New York. The City is authorized by law to maintain a police department, and does maintain the NYPD, which acts as its agent in the area of law

5

enforcement and for which it is ultimately responsible. The City assumes the risks incidental to the maintenance of a police force and the employment of police officers.

20.    Defendant Detective Sergeant Frank Viggiano was at all times relevant to this Complaint a duly appointed and acting Detective Sergeant of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is being sued in his individual capacity.

21.    Defendant Detective Stanley Schiffman was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is being sued in his individual capacity.

22.    Defendant Detective Sevelie Jones was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is being sued in his individual capacity.

23.    Defendant Detective Donald Schappert was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes ordinances, regulations, policies,

customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is being sued in his individual capacity.

24.     Defendant Detective Eugene Maloney was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is being sued in his individual capacity.

25.     Defendant Detective Bade was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is being sued in his individual capacity.

26.     Defendant the City was also at all relevant times herein authorized to act through the Bronx County District Attorney's Office ("Bronx DA's Office") in regard to investigation, evaluation, and prosecution of alleged criminal conduct within Bronx County.

27.     The Bronx DA's Office was at all times relevant herein a municipal entity created and authorized under the laws of the State of New York to investigate and prosecute criminal conduct within Bronx County.

28.     Defendant Bronx County Assistant District Attorney ("ADA") Elisa Koenderman, née Spatola, was at all times relevant herein a duly appointed and acting ADA of the Bronx DA's

Office, acting under color of law and in her individual capacity within the scope of employment pursuant to the statutes, ordinances regulations, policies, customs, and usage of the City of New York and the State of New York. She is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. She is being sued in her individual capacity.

29.     Defendant Stacey Blocker a/k/a Stacey Green (hereinafter referred to as "Stacey Green") was at all times relevant to this Complaint, a citizen and resident of City of New York, the State of New York, and the Bronx County.

## STATEMENT OF FACTS

### The Burton Family

30.     Keziah and Raphael Burton were both born in Jamaica. They moved to England, where they married in 1970, and then moved to the United States. The Burtons settled in New York City, where Keziah worked as a registered nurse and Raphael was an independent contractor who did interior and exterior design. Huwe Burton, the only child Keziah and Raphael had together, was born in 1972. Huwe had a close and loving relationship with both of his parents and was especially close to his mother.

31.     In 1984, the Burtons bought a three-family building at 3515 Eastchester Road, Bronx, New York. The building had a front door that opened into a common hallway with stairs that led to each of the three apartments. The Burtons lived in the second-floor apartment and rented out the ground and third floor apartments.

32.     On January 3, 1989, Keziah Burton was fifty-nine years old and had just begun a two-week vacation from her job as a registered nurse at Beth Abramson Hospital. Mrs. Burton planned to spend the day shopping with her friend, Princess Sampson, and Ms. Sampson's aunt. Raphael Burton, who was sixty-seven years old, was in Jamaica at the time visiting his mother and

other family members. He planned to return home a few days later. Huwe Burton, who was sixteen years old, was resuming school after the winter break at Evander Childs High School, where he was a sophomore. At approximately 7:45 a.m., Huwe said goodbye to his mother and left for school. Mrs. Burton told him to have a nice day.

33.      Huwe arrived at school at approximately 8:05 a.m. and remained there until approximately 1:35 p.m., when he decided to cut his last class. Huwe left school and made his way home, while chatting with friends along the way.

34.      At approximately 2:45 p.m., Huwe arrived home and noticed that his mother's car was gone. As he entered the apartment building, he heard his phone ringing. He rushed upstairs to answer the phone, which was just inside the entrance of the apartment. The call was from Huwe's girlfriend, who asked Huwe to come over to her apartment. Huwe immediately left, assuming his mother was not home given that her car was not there.

**The Murder of Keziah Burton**

35.      At approximately 5:30 p.m. on January 3, 1989, Huwe returned home and, noticing his parents' bedroom door slightly ajar, he peaked in and found his mother, Keziah Burton, face-down on her bed with her blood-caked face partially resting on a blood-soaked pillow. Her house dress and slip had been pulled up and she was nude below the waist. A telephone cord, apparently taken from the phone on her bedside table, was wrapped around her right wrist. Huwe immediately called 911 for help. He told the operator he thought his mother had been murdered and ran downstairs to wait for the police.

36.      When he got downstairs, he encountered Defendant Stacey Green, one of the downstairs tenants, who claimed she had been locked out of her own first floor apartment. They spoke briefly. The police arrived at the Burton home shortly thereafter.

9

37.     Police officers, including Detectives Viggiano, Schiffman, and Jones from the 47th Precinct, and Detective Schappert from the Bronx Homicide Task Force, responded to the scene.

38.     ADA Koenderman was assigned to the case. Upon information and belief, ADA Koenderman was fully apprised of the detectives' activities, and participated in and provided oversight and guidance to the detectives conducting the investigation.

39.     The detectives observed that Mrs. Burton had two stab wounds, one on each side of her neck. Detectives observed two bloody streak marks on the back of Mrs. Burton's house dress that were consistent with someone wiping a bloody knife on her back. A steak knife and a pair of woman's underwear were found on the bedroom floor. The knife tested negative for the presence of blood. Detectives did not find the presence of sperm at the crime scene.

40.     While the downstairs entrance to the apartment building showed no damage, detectives observed that the front door to the Burton's apartment was damaged around the doorknob key-lock and corresponding section of the door jamb. The damage to the doorknob key-lock, not readily apparent when the door was shut, appeared consistent with a forced entry. In the living room, detectives found Mrs. Burton's pocketbook turned over on the floor next to some papers. Examination of her pocketbook revealed that it contained several of Mrs. Burton's credit cards but no cash. The detectives also observed that a sliding door to a small patio overlooking the front driveway was unsecured and a few inches ajar. Mrs. Burton's car was missing from the driveway.

41.     Detectives removed and vouchered several items from the crime scene for forensic testing including, but not limited to, Mrs. Burton's clothing, hair, and fibers that had been found on or about Mrs. Burton's body, the telephone cord that had been wrapped around Mrs. Burton's wrist, the knife found by the bed, a swatch of rug from the bedroom, the lock assembly from the

Burton's front door, and several other objects belonging to Mrs. Burton that may have been disturbed during the crime, *e.g.*, her credit cards, keys, and jewelry. They also took numerous photos of the crime scene.

42.     A medical examiner performed an initial examination of Mrs. Burton's body and observed that, based on the amount of rigor mortis that had set in, the time of her death was approximately 11:45 a.m.

43.     Detectives Viggiano, Schiffman, Jones, and Schappert surmised that the murder was an "inside job" committed by someone with access to the apartment building, and unreasonably focused their investigation on Huwe. Distraught from the discovery of his mother victimized by a violent murder and unaware that he was a suspect, Huwe sought to help the detectives solve his mother's murder and the Detectives repeatedly questioned him without a guardian present.

44.     Detective Schiffman questioned Huwe for hours, first at his family's apartment, then at the 47th Precinct. Huwe provided Detective Schiffman with a true account of his activities for that day.

45.     Huwe told Detective Schiffman that he had left his apartment at 7:45 a.m. that morning to go to school after saying goodbye to his mother. Huwe described how he had arrived at school at 8:05 a.m. and remained there until approximately 1:35 p.m., when he cut his last class and made his way home while talking to friends along the way. Huwe described how, when he arrived at his building at about 2:45 p.m., he noticed that his mother's car was gone. He assumed she was out shopping.

46.     Huwe explained to Detective Schiffman how, as he entered the building, he heard the phone ringing and rushed upstairs to his apartment to answer the phone near the front door.

Assuming that his mother was out shopping, Huwe rushed back out and went to his girlfriend's apartment where they listened to music and had sex.

47.     Huwe told Detective Schiffman that he then returned to his apartment between 5:30 p.m. and 5:40 p.m. After taking off his jacket and putting it in his room, Huwe noticed that his parents' bedroom door was unusually ajar. He looked into the room where he saw his mother's bloodied and partially disrobed body on the bed.

48.     Detectives immediately corroborated Huwe's account of his whereabouts. Detectives spoke to Huwe's girlfriend who confirmed that Huwe had been with her at her apartment that afternoon and told detectives that he had acted entirely normal. Other detectives spoke to Stephen Wilkenson, a close friend who had been with Huwe the prior night. Stephen also described Huwe's behavior from the prior night as entirely normal. Detectives visited Mrs. Burton's workplace and interviewed her coworkers who said that Mrs. Burton had a loving relationship with her son. Upon information and belief, detectives performed background checks on Huwe and his family and learned that they had no record of domestic disputes and no criminal history.

49.     Detective Schappert spoke to Princess Sampson, who told him that she had made plans to go shopping with Mrs. Burton that day. Mrs. Burton was supposed to pick Ms. Sampson and her aunt up in her car between 9:00 a.m. and 10:00 a.m. When 10:00 a.m. passed without Mrs. Burton showing up, Ms. Sampson began calling the Burton residence. Ms. Sampson told Detective Schappert that all of her calls went unanswered.

50.     Detective Jones interviewed the Burtons' downstairs neighbors, Emanuel and Stacey Green. The Greens began renting the apartment from the Burtons approximately one month earlier. Emanuel Green falsely told Detective Jones that he had left for work at 7:00 a.m. that

12

morning, that he did not notice anything unusual, and that he did not learn of Mrs. Burton's murder until he returned home that evening. Stacey Green falsely told Detective Jones that when she was leaving for work at 8:10 a.m., Mrs. Burton called out and asked to speak to her. Stacey claimed she told Mrs. Burton she would speak to her later because she was running late and left in a cab. Stacey told Detective Jones that she learned of Mrs. Burton's murder when she returned home after her work.

51.    Detective Jones advised the other detectives, including Detectives Viggiano, Schiffman, and Schappert, of the information he had learned from Emanuel and Stacey Green. Despite their belief the murder had been an inside job, the detectives inexplicably and unreasonably failed to corroborate the information the Greens had provided as they had done with Huwe.

52.    If Detectives Viggiano, Schiffman, Jones, or Schappert had conducted a reasonable investigation and attempted to corroborate the Greens' information, they would have learned that both Emanuel and Stacey had lied to Jones and that neither of them had gone to work that day. The detectives would have also learned that Emanuel and Stacey had financial problems. The detectives also failed to run any criminal history checks on the Greens. If they had, they would have learned that Emanuel had a significant history of criminality and mental illness, that he was presently on parole for a rape and a robbery, and that both Emanuel and Stacey had been arrested for assaulting and menacing their prior landlord before moving into the Burtons' apartment building.

53.    Upon information and belief, the detectives believed that Mrs. Burton had been murdered sometime between 8:10 a.m., when Stacey Green, the last person to report seeing her

alive, claims she spoke to her in front of their building, and 10:00 a.m., when Mrs. Burton failed to make her appointment with Ms. Sampson.

54.     On or about January 5, 1989, detectives, including Detectives Viggiano, Jones, Schiffman, and Schappert, received erroneous information from Huwe's first period teacher, Ms. Bernicke, that Huwe had not attended his first period class from 8:10 a.m. to 8:50 a.m. on the day of his mother's murder.

55.     Huwe had in fact attended that class, but Ms. Bernicke had marked the wrong column on her attendance sheet which resulted in her erroneous information to detectives.[1]

56.     Without verifying Mss. Bernicke's information, detectives, including Detectives Viggiano, Jones, Schiffman, and Schappert, jumped to the conclusion that Huwe had lied to them about attending his first period class in order to give himself a false alibi for the murder of his mother sometime between the time Stacey Green said she talked to Mrs. Burton at 8:10 a.m. and 8:50 a.m., which is when a teacher had reported Huwe attending homeroom before his second period class.

57.     Rather than continuing to try to solve Mrs. Burton's murder through lawful means, the detectives abandoned legitimate investigatory efforts and focused on quickly closing their investigation by building a case against Huwe by conspiring to subject Huwe to a coercive interrogation.

**Pattern and Practice of Coercive Interrogations**

58.     At and around the time of Mrs. Burton's murder, NYPD detectives had adopted a pattern and practice of improperly using coercive interrogation techniques to force suspects into "confessing" to crimes. These techniques included, *inter alia*, coercion, isolation, intimidation,

---

[1] As detailed herein, only days later, Ms. Bernicke informed the detectives of her error, and that Huwe had, in fact, attended his first period class.

manipulation, suggestiveness, deceit, false promises, withholding information, "feeding" or suggesting false facts, and actively shaping the contents of a statement before the statement was formally given. NYPD Detectives used these techniques to persuade suspects, particularly youthful and inexperienced suspects like Huwe, that they were unequivocally in trouble with the police, and that the only viable way to escape the situation and to avoid punishment was to cooperate with detectives and adopt the fabricated statements as they demanded. The detectives would then propose scenarios and coerce the suspect into deciding upon a "confession" to the crime that would typically then be set down in written and/or video statements. The detectives would then forward this fabricated evidence to prosecutors.

**Viggiano, Schiffman, and Jones Coerce False Confessions in the Coss and Parker Case**

59.    At or about January 1989, NYPD Detectives, including Viggiano, Jones, Schiffman, and Schappert, and members of the Bronx DA'S Office, including ADA Koenderman, were aware that these coercive interrogation techniques resulted in false confessions.

60.    Less than three months prior to their investigation of Mrs. Burton's murder, Detectives Viggiano, Jones, and Schiffman, had jointly participated in feeding false facts and coercing detailed and demonstrably false "confessions" from Dennis Coss, a teenager, and Kelvin Parker, a 27-year-old, in which they both falsely stated that they had participated with Robert Amonte, their friend, in murdering a security guard while robbing a Key Food supermarket in the Bronx. The detectives had been under pressure to solve the high-profile murder for months when Amonte and Coss were picked up driving a stolen car. Parker was separately brought to the 47th precinct later that evening. Detective Schiffman claimed he had a hunch that Amonte was involved in the Key Food murder when he saw Amonte and Coss at the precinct.

61.     Amonte, Coss, and Parker were separately interrogated by Detectives Viggiano, Jones, and Schiffman. While Amonte did not cooperate, Coss and Parker both gave written "confessions" after being subjected to coercive interrogation tactics. The detectives falsely caused Coss and Parker to believe that Amonte and other witnesses had placed them at the crime scene and falsely told Coss and Parker that fingerprint evidence proved Amonte was involved in the murder. The detectives also falsely caused Coss and Parker to believe that they would not be prosecuted and would be able to go home if they cooperated by providing a statement implicating Amonte in the murder and placing themselves at the crime scene. Detectives isolated Coss from his family, telling him that he could only see them if he cooperated and provided the requested statement implicating Amonte. Coss and Parker eventually broke down and agreed to cooperate with the detectives. The detectives then fed Coss and Parker false facts and information to create "confessions" consistent with the detectives' fabricated account of the evidence. As a result of the detectives' coercive interrogation techniques, Coss and Parker each signed written statements admitting to participating in the murder with Amonte and including details only the perpetrator and the police could know. Coss and Parker recanted their statements shortly after they were given.

62.     A few days after Coss and Parker had "confessed," police discovered that Amonte had been incarcerated at the time of the Key Food robbery and, therefore, could not have been involved in that crime. Despite this incontrovertible evidence that the Coss and Parker "confessions" were false, Detectives Viggiano, Jones, and Schiffman maintained that the Coss and Parker arrests were proper. After a three-week trial, a jury acquitted Coss and Parker after only ten minutes of deliberation. Coss and Parker sued the City of New York for the detectives' misconduct. Both cases eventually settled.

**Detectives Coerce Huwe To Falsely "Confess" to His Mother's Murder**

63.     Similar to their misconduct in the Coss and Parker case, Detectives Viggiano, Schiffman, and Jones, together with Detective Schappert, subjected Huwe to a coercive interrogation to prove their hunch and quickly close the murder case.

64.     On the evening of January 5, 1989, the detectives brought Huwe to the 47th Precinct. After Huwe was forced to wait for approximately an hour, Detectives Viggiano and Jones began asking Huwe routine questions about his whereabouts on the day of the murder. Soon thereafter, though, they began using coercive interrogation techniques to induce Huwe to confess to his mother's murder.

65.     They insisted that Huwe was lying to them about attending his first period class and that they had evidence to prove that he was not in school when he said he was. They told sixteen-year-old Huwe that he was guilty of statutory rape for having sex with his thirteen-year-old girlfriend and threatened to send him to Rikers Island if he did not cooperate and confess to his mother's murder. Detectives Viggiano and Jones gave gratuitous descriptions of what would happen to Huwe if he was sent to Rikers Island for statutory rape.

66.     Huwe was terrified by the detectives' actions and their description of what would happen to him if he did not cooperate with them. Huwe pleaded to see his father who he knew had returned from Jamaica. Although they were aware Mr. Burton was desperately trying to reach his son at the same time, the detectives refused Huwe's request.

67.     Detectives Viggiano and Jones, aware that there was no evidence that Huwe Burton had intentionally killed his mother, concocted a scenario, which they suggested to Huwe that his mother's death was caused by an accident. The detectives pressured Huwe to adopt this theory that his mother's death was an accidental murder. If he did so, the detectives assured Huwe that they

would help him by making sure he went to Family Court to be released to his father instead of going to Rikers Island and spending the rest of his life prison.

68.     Huwe, still in shock and grieving over his mother's death, was terrified by the detectives' threats and insinuations. He had no experience with the police or criminal justice system and had been raised to respect and obey the police. After hours of being subjected to the detectives' coercive interrogation techniques, Huwe gave in to their demands.

69.     Detectives Viggiano and Jones used suggestion and fed Huwe false facts leading him to create a statement that conformed to the detectives' view of the evidence.  For example, the detectives repeatedly suggested  that Huwe must have been "stimulated" by drugs when he stabbed his mother, Huwe eventually succumbed to this pressure and  agreed that he had been "stimulated" by drugs when he stabbed his mother. When the detectives asked what drug Huwe had been "stimulated" on, Huwe improvised by saying marijuana. When the detectives told him that marijuana would not "stimulate" him enough to accidently stab his mother and insisted that he must have been on something stronger, like crack, Huwe, eager to please the detectives, then complied and said that he had been "stimulated" on crack.

70.     Huwe adopted the detectives' suggestions and false facts to create a false confession statement only because of the detectives' pressure and the false promise that he would go to Family Court and not Rikers' Island for the crime of statutory rape.

71.     Detectives Viggiano, Jones, Schiffman, Schappert and other NYPD detectives knew that Huwe's written "confession" was wholly unreliable, untrustworthy, false, and the product of their improper suggestion and coercive interrogation techniques.

72.     The detectives also pressured Huwe to provide a videotaped "confession" for the Bronx County District Attorney. For the videotaped "confession," Huwe recited the false account

18

of his mother's murder that the detectives had coerced him into making. Huwe had memorized the details of the statement through the exhaustive repetition of the coercive interrogation.

73.     Detectives Viggiano, Jones, Schiffman, Schappert and other NYPD detectives knew that Huwe's videotaped "confession" was wholly unreliable, untrustworthy, false, and the product of their improper suggestion and coercive interrogation techniques.

74.     Upon information and belief, ADA Koenderman either knew about, encouraged, or permitted Detectives Viggiano, Schiffman, Jones, and Schappert to fabricate Huwe's false "confession."

75.     Detectives Viggiano, Jones, and Schappert falsely represented in written reports and oral statements that Huwe had voluntarily confessed to his mother's murder, without any threats, intimidation, coercion, or suggestion, and forwarded these false reports to the Bronx DA's Office. The detectives hid their misconduct with respect to Huwe's "confession" from the grand jury, Huwe's defense counsel, the court, and the jury at Huwe's criminal trial.

76.     After the videotaped "confession" was complete, the defendant detectives contacted members of the media to publicize Huwe's arrest. Detective Viggiano knowingly gave false statements to the press, including that Huwe had killed his mother in a rage after she had refused to give him money to buy crack and that Huwe had tried to hide his crime by manipulating his mother's corpse to look like she had been raped.

77.     Detective Viggiano further told the press that they had immediately suspected Huwe of murdering his mother because he was "not as distraught" as they thought he should be. Despite making official reports that Huwe's confession had been voluntary, Detective Viggiano told the press that Huwe only admitted to the crime after being confronted with discrepancies in his story, after which, "the boy broke down."

78.     Detective Viggiano notified the press when Huwe would be transported from the 47th Precinct to the Bronx Supreme Court so that he could be photographed subjecting Huwe to a "perp walk."

79.     The information provided by the detectives generated sensational headlines, such as "Crack-Crazed Teen Stabs Mom to Death" and "Teen Killed Mom Over $200 to Pay Crack Bill, Cops Say."

80.     Huwe learned that the detectives had deceived him about going to Family Court and being released to his father when he was transported to Bronx Criminal Court. At Bronx Criminal Court, Huwe was charged with intentional murder and criminal possession of a deadly weapon. The detectives' fictional account of Huwe intentionally murdering his mother to pay off a crack debt caused bail to be set at a high amount, which the Burton family could not afford. Huwe was remanded to Rikers Island.

**The First Grand Jury**

81.     On the basis of the false and fabricated "confession" detectives had coerced Huwe into making, ADA Koenderman, who, upon information and belief, knew that the confession was false, convened a grand jury to hear the case against Huwe on January 9, 1989.

82.     Detective Jones was the key witness for the prosecution against Huwe in the Grand Jury.

83.     Detective Jones misled the grand jury by falsely testifying as to the contents of the "confession" detectives had coerced Huwe into making.

84.     ADA Koenderman intentionally did not advise the grand jury of material information in her possession that Detective Jones and other detectives had subjected Huwe, a

sixteen-year-old with no prior experience with the police, to a coercive interrogation to obtain his "confession."

85.     ADA Koenderman intentionally failed to present the grand jury with material information in her possession that Detective Jones and the other detectives who had obtained Huwe's "confession" had a pattern and practice of using coercive interrogation techniques to obtain false confessions, or that these same detectives had coerced two young men into falsely confessing to murder just three months earlier. ADA Koenderman was aware that the information she intentionally withheld was favorable to Huwe because, *inter alia*, it would have made the detectives appear less credible and caused the grand jury to question the integrity and the reliability of Huwe's "confession."

86.     On January 10, 1989, while the grand jury was still hearing evidence in Huwe's case, detectives, including Detectives Viggiano, Jones, Schiffman, Schappert, and, upon information and belief, ADA Koenderman, learned that their basis for suspecting Huwe of his mother's murder was ill-founded when Ms. Bernicke came forward and advised them that she had been mistaken when she told them Huwe had been absent from his first period class on the day of his mother's murder. Ms. Bernicke advised the detectives that Huwe had, in fact, attended that class.

87.     The detectives, including Detectives Viggiano, Jones, Schiffman, and Schappert, recognized that this information meant Huwe had been honest with them and had not attempted to provide himself with a false alibi for his mother's murder.

88.     The detectives further recognized that Ms. Bernicke's information provided Huwe with a strong alibi for his mother's murder—Huwe could not have murdered his mother before

school if he was in school and attending class at 8:05 a.m. at and about the same time Stacey Green was claiming to have seen and spoken to Mrs. Burton.

89.     Detectives Viggiano, Schiffman, and Jones recognized that, similar to the Coss and Parker case, this evidence of Huwe's innocence would clearly be taken as evidence that his "confession" had been coerced. Upon information and belief, Detectives Viggiano, Schiffman, and Jones recognized that this evidence that they had coerced Huwe into falsely confessing to his mother's murder, coming so soon after the discovery of the false "confessions" they had coerced Coss and Parker into making, would reflect adversely on their reputations as detectives and could affect their job security.

90.     Detectives Viggiano and Jones immediately re-interviewed Stacey Green, who falsely re-affirmed to them that she had seen and spoken to Mrs. Burton on January 3, 1989, at 8:10 a.m., as she was leaving for work. The detectives then canvassed the neighborhood for Mrs. Burton's car—an investigative step they had not previously reported undertaking.

91.     On January 11, 1989, ADA Koenderman reconvened the grand jury hearing the case against Huwe.

92.     Upon information and belief, ADA Koenderman, who was aware that the recent information from Ms. Bernicke was exculpatory, intentionally did not provide it to the grand jury to prejudice Huwe.

93.     Because of the false and misleading information provided by Detective Jones, and the failure of ADA Koenderman and detectives to provide material and exculpatory information in their possession, the grand jury voted to indict Huwe for the murder of his mother.

**The Case Against Huwe Further Unravels**

94.     Hours after the grand jury voted to indict Huwe, detectives at the 47th Precinct were notified that Mrs. Burton's missing car had been recovered by members of the Mount Vernon Police Department. Police officers had reportedly stopped the car after it ran a stop sign and learned the car was stolen. Defendant Detective Viggiano, accompanied by Defendant Detectives Eugene Maloney and Bade, responded to the Mount Vernon Police Department. When they arrived, Detective Viggiano recognized that the person caught driving Mrs. Burton's stolen car was the Burtons' downstairs tenant, Emanuel Green. Emanuel did not have an innocent explanation for possessing Mrs. Burton's car.

95.     The detectives knew that Emanuel Green had lied to Detective Jones about not having any information about Mrs. Burton's murder. The detectives also learned that Emanuel was employed as a bouncer at a night club, worked nights, and had lied about going to work on the morning of Mrs. Burton's murder. The detectives recognized that this information likely established that Emanuel Green had done what they had erroneously accused Huwe of—lying to police—to provide himself with a false alibi for Mrs. Burton's murder.

96.     Upon information and belief, the detectives also learned that Emanuel had a substantial criminal record of crimes similar to the one committed against Mrs. Burton. At the time of his arrest in Mount Vernon, Emanuel was on parole for a violent rape and an unrelated robbery in which he had used a steak knife that he kept concealed in his sock to threaten his victim. Detectives also learned that Emanuel and Stacey had open charges against them for assaulting and menacing their previous landlord before moving into the Burton's apartment.

97.     Detectives also learned that the Greens had problematic financial issues and that Emanuel feared that he and Stacey could not afford a new apartment if they had to leave the Burtons' building.

98.     The detectives recognized that Emanuel fit their theory that the murder was an "inside job" committed by someone with access to the apartment building.

99.     The detectives recognized that this evidence established that Emanuel Green most likely murdered Mrs. Burton and that Huwe was innocent.

100.    The detectives also recognized that the evidence pointed to Stacey Green being, at minimum, an accomplice to Mrs. Burton's murder. Stacey had attempted to bolster Emanuel's false alibi by repeatedly lying to detectives that Emanuel had left for work at 7:00 a.m. She had also withheld from detectives the material information that Emanuel was in possession of Mrs. Burton's stolen car.

101.    Upon information and belief, Detectives Viggiano, Schiffman, Jones, and Schappert recognized that if Emanuel Green was responsible for Keziah Burton's murder, and not Huwe, it would reflect adversely on them as police officers. The detectives would have to concede that they had coerced a sixteen-year-old boy into confessing to the horrific murder of his own mother when the actual murderers had been easily identifiable had they done a minimal investigation. The detectives recognized this information would create a tremendous amount of negative publicity, especially considering the widespread media attention generated by their false claim that Huwe had murdered his mother for crack money.

102.    Detectives Viggiano, Jones, and Schiffman recognized this revelation would further jeopardize, if not ruin, their careers in law enforcement because of the recent discovery that they had only three months earlier coerced false confessions to murder in the Coss and Parker case.

Upon information and belief, Detectives Viggiano, Jones, and Schiffman were concerned that the revelation that they had coerced multiple false confessions in two unrelated murders in such a short span of time would bring unwanted scrutiny to other cases that they had improperly handled. Based on these concerns, the detectives intentionally ignored evidence of Emanuel and Stacey's guilt and focused on bolstering their false case against Huwe.

103.   Stacey Green was brought to the Mount Vernon Police Department to help in getting Emanuel to cooperate and both she and Emanuel were promised leniency if they cooperated with the detectives.

104.   Emanuel and Stacey agreed to cooperate with the detectives by adopting a false narrative prepared by Detectives Viggiano, Maloney, and Bade as to why Emanuel was found in possession of Mrs. Burton's car, which was stolen on the day Mrs. Burton was murdered.

105.   The statement prepared for Emanuel falsely stated that Huwe had approached Emanuel after murdering his mother seeking help, that Emanuel had then attempted to help Huwe conceal the murder by making it look like a rape and robbery, and that Emanuel then took possession of Mrs. Burton's car in order to sell it and split the proceeds with Huwe..

106.   The statement prepared for Stacey falsely stated that she had gone to work on the morning of Mrs. Burton's murder and that she did not learn until later in the week that Emanuel had attempted to help Huwe cover up his mother's murder or that he possessed Mrs. Burton's car. The detectives intentionally omitted Stacey's information that she had seen and spoken to Mrs. Burton at 8:10 a.m. on the morning of the murder in order to negate Huwe's alibi.

107.   Emanuel additionally provided a videotaped statement in which he conveyed essentially the same information that had been prepared for him in his statement.

108.    In exchange for agreeing to provide false statements to save the case detectives had falsely built against Huwe and prevent disclosure of their misconduct in coercing Huwe's false "confession," Emanuel and Stacey were given favorable treatment and leniency. Even though he admitted to aiding in covering up the murder of Mrs. Burton, Emanuel was only charged with possessing stolen property and hindering a prosecution—not murder—and was not taken into custody for violating his parole. Stacey Green was not charged with any crime.

109.    Defendants ADA Koenderman and Detectives Schiffman, Jones, and Schappert either knew about, encouraged, or permitted the detectives, including Detectives Viggiano, Maloney, and Bade, to fabricate the statements signed by Emanuel and Stacey Green.

110.    Detectives Viggiano, Maloney, and Bade, falsely represented in written reports and oral statements that Emanuel and Stacey Green had freely volunteered their statements inculpating Huwe, without any threats or promises of leniency. The detectives deliberately suppressed their misconduct with respect to Emanuel and Stacey Green's statements from the grand jury, defense counsel, the court, and the jury.

**Suppression of Evidence**

111.    Immediately after Huwe's indictment, Huwe's defense counsel, William Kunstler, requested production of the Bronx DA's file concerning Emanuel Green's arrest.

112.    Though evidence of the dealings between Emanuel and Stacey Green and the detectives was clearly material and exculpatory, ADA Koenderman improperly refused to turn over the requested information. ADA Koenderman falsely represented to Mr. Kunstler and the Court that the requested information was "not relevant" to Huwe's prosecution.

113.    On or about February 8, 1989, ADA Koenderman entered into a Voluntary Disclosure Agreement with Kunstler and agreed to disclose all *Brady* material, all items contained

in New York Criminal Procedure Law 240.20, and all arrest reports, complaint reports, follow-up reports, vouchers, and memo book entries relating to Huwe's case.

114.    Despite entering into this agreement, ADA Koenderman knowingly and improperly failed to turn over material and exculpatory information in her possession including, but not limited to: photographs of the Burton apartment front door showing signs of a forced entry; a complaint-follow up report documenting Ms. Bernicke's information that Huwe attended his first period class on the morning of his mother's murder; and documents concerning Emanuel and Stacey Green related to Emanuel's arrest in Mount Vernon.

**The Second Grand Jury**

115.    ADA Koenderman convened a second grand jury on or about August 16, 1989, seeking a superseding indictment against Huwe for the additional charges of felony murder and robbery. Emanuel Green and Detective Jones, among others, testified before the grand jury.

116.    Consistent with the statement Detectives Viggiano, Maloney, and Bade had concocted for him, for which he received leniency in exchange for his testimony, Emanuel Green falsely testified that Huwe told him that he  murdered his mother and that Emanuel had only helped Huwe attempt to conceal the murder and sell Mrs. Burton's car.

117.    ADA Koenderman knowingly and intentionally did not advise the grand jury of material information in her possession that Emanuel Green had been convicted of a rape and a robbery he had committed with a steak knife, had recently been arrested for allegedly assaulting and menacing his prior landlord, and was currently on parole. ADA Koenderman was aware that Emanuel Green's criminal history information was favorable to Huwe because, *inter alia*, it revealed a *modus operandi* that fit the evidence of Mrs. Burton's murder and that Emanuel was not credible.

118.   During the grand jury, ADA Koenderman knowingly elicited false testimony from Emanuel that Huwe murdered his mother around 7:45 a.m. ADA Koenderman intentionally did not correct this false testimony or inform the grand jury that Emanuel had previously testified the murder occurred at approximately 9:00 a.m.—information in her possession that was material and exculpatory to Huwe because Huwe was known to have been at school at that time.

119.   ADA Koenderman intentionally did not advise the grand jury of the information in her possession that was material and exculpatory to Huwe that Stacey Green had seen Mrs. Burton alive and spoken to her around 8:10 a.m., at which time Huwe was known to have been at school attending class. ADA Koenderman was aware that this information was favorable and exculpatory to Huwe because it provided him with a strong alibi for his mother's murder.

120.   When a grand juror raised the question of what Emanuel's intention was in helping Huwe, Emanuel falsely testified, "Because me and Huwe have done a lot of different things together." Although ADA Koenderman knew this testimony was false, she did not attempt to correct it or advise the grand jury of material information in her possession that Emanuel had previously stated that he had acted out of "greed for money." ADA Koenderman also did not advise the grand jury that, if Emanuel knew Huwe at all, it could not have been for more than the month prior to the murder when he began renting the Burton's apartment. ADA Koenderman was aware that this information was favorable to Huwe because it, *inter alia*, would have made Emanuel Green's accusations against Huwe appear not credible to the grand jury

121.   Detective Jones' testimony to the second grand jury suffered the same defects as his testimony to the first grand jury. (*See* ¶¶ 81–85, 93 *supra*).

122.   Detective Jones also falsely testified in front of the second grand jury that Huwe had admitted to participating with Green in attempting to cover-up his mother's murder when

Huwe's "confessions" contained no mention of Emanuel Green. ADA Koenderman knew that Huwe had never made such an admission but intentionally failed to correct Detective Jones' false testimony.

123.    Because of the false and misleading information provided by Detective Jones, and the failure of ADA Koenderman and detectives to provide material and exculpatory information in their possession, the second grand jury voted to indict Huwe for the charges of felony murder and robbery.

124.    Despite the violation of his parole and the serious crimes for which he had been arrested, Emanuel Green was released from custody after testifying at Huwe's second grand jury. Upon information and belief, Emanuel's unwarranted release was part of the lenient treatment he had bargained for with the detectives and prosecutors in return for providing false evidence promised to him if he inculpated Huwe.

### The *Huntley* Hearing

125.    In September of 1989, Judge Dominic Massaro held a *Huntley* hearing regarding Huwe's motion to suppress his "confession."

126.    The *Huntley* hearing suffered from the same defects as Huwe's grand jury proceedings. (See, *e.g.*, ¶¶ 81–85, 93 *supra*). In particular: the primary witness for the prosecution, Detective Jones, misled Judge Massaro by falsely testifying about the contents and circumstances of Huwe's "confession" and by withholding exculpatory evidence.

127.    ADA Koenderman also improperly prejudiced Huwe's case by continuing to withhold *Brady* material. (*See, e.g*., ¶¶ 85, 92 *supra*).

128.    Huwe testified and gave his account of his whereabouts and activities on January 3, 1989, which was consistent with the initial statement he gave to Detective Schiffman in the early

stages of the investigation. Huwe additionally explained how the detectives had coerced him into making the "confession."

129.    Because of the prosecution's misconduct in eliciting false testimony from Detective Jones and withholding material information that was exculpatory to Huwe, Judge Massaro denied the motion to suppress Huwe's false "confession."

**Evidence of Stacey Green's False Alibi and Lying to Police**

130.    On or about March 19, 1990, ADA Koenderman subpoenaed Stacey Green's work records for January 3, 1989. One week later, ADA Koenderman received a response to her subpoena including timesheets evidencing that Stacey Green did not go to work on January 3, 1989.

131.    Upon information and belief, ADA Koenderman recognized this information was material and exculpatory to Huwe. It established that Stacey, like Emanuel, had lied to detectives to provide them both with a false alibi for the day of Mrs. Burton's murder. It also established that Emanuel lied to police to protect Stacey, and that his signed statement inculpating Huwe contained demonstrably false information, including that Stacey had left for work before Huwe had allegedly come down to talk to Emanuel about helping him cover up his mother's murder.

132.    ADA Koenderman and the defendant detectives recognized that this evidence placed Stacey—who had reported seeing Mrs. Burton and speaking to her after Huwe was known to have been at school attending class and was the first person to arrive on the scene when Huwe discovered his mother's murder—either at home or with Emanuel Green at the time of Mrs. Burton's murder and provided probable cause to believe that both were complicit in the murder.

133.    Despite the materiality and exculpatory value of this evidence, ADA Koenderman intentionally withheld that evidence from Huwe's defense counsel and the Court.[2]

**ADA Koenderman's Continued *Brady* Violations**

134.    On or about September 9, 1990, Huwe's defense counsel renewed his request that ADA Koenderman produce all of the files that the Bronx DA's Office had on Emanuel Green. Judge Massaro ordered ADA Koenderman to disclose all relevant information.

135.    Notwithstanding her clear duty to obey Judge Massaro's order, ADA Koenderman again did not produce the Green file.

136.    On March 4, 1991, Huwe's defense counsel again renewed his request for ADA Koenderman to turn over the Green file.

137.    On March 14, 1991, ADA Koenderman produced Emanuel Green's grand jury testimony, his written and videotaped statements, and his arrest records regarding the theft of Mrs. Burton's car.

138.    Although she did not have the discretion to pick and choose which portions of the Green file she produced, ADA Koenderman further violated Judge Massaro's order by intentionally failing to produce Stacey Green's statements after Emanuel's arrest or Stacey Green's timesheet for the day of Mrs. Burton's murder, though they were in her possession. ADA Koenderman was aware that this information was favorable to Huwe because, *inter alia*, it evidenced collusion between Emanuel and Stacey Green and the detectives in the creation of Emanuel's "confession", established that Emanuel and Stacey lied to the police to provide Stacey with a false alibi for the day of Mrs. Burton's murder, and that they continued to lie when they signed the false statements detectives had prepared for them in Mount Vernon.

---

[2] On the same day ADA Koenderman received evidence that Stacey Green had lied about going to work on the day of Mrs. Burton's murder, Emanuel was shot and killed in connection with an unrelated incident.

**The Trial**

139.    Huwe Burton was tried before a jury from September 10, 1991 through September 25, 1991.

140.    Huwe's trial contained many of the same defects as the two grand jury proceedings and the *Huntley* hearing.

141.    Again, ADA Koenderman knowingly elicited false testimony from Detective Jones describing how Huwe's "confession" came about, and she again intentionally withheld material and exculpatory information which would have established that Emanuel and Stacey Green, and not Huwe, was responsible for Mrs. Burton's murder. (*See, e.g.,* ¶¶ 81-85, 92, 118, 120, 122-123, 131-134, 139 *supra*).

142.    The defense argued, as it had consistently done long before trial, that Emanuel had committed the murder and that Huwe's confession was coerced.

143.    The prosecution countered that Huwe, a 16-year-old with no prior criminal record, intentionally omitted mention of Green in his confession because he was shrewdly setting up a manslaughter defense and feared that Green would provide proof that the murder was deliberate and not in the heat of passion.

144.    Before the jury was charged with deciding Huwe's case, Mr. Kunstler requested that Judge Massaro advise the jury of ADA Koenderman's misconduct in failing to make timely disclosure of the Green materials. While Judge Massaro agreed that ADA Koenderman had behaved improperly, he decided not to advise the jury because ADA Koenderman had "exonerated" herself of her misconduct by ultimately supplying those materials. ADA Koenderman did not advise Judge Massaro or Mr. Kunstler that there were additional material and exculpatory documents regarding the Greens that she had never turned over.

145.    As a result of the detectives false and misleading testimony at trial, as well, ADA Koenderman's intentional failure to turn over material and exculpatory evidence of Huwe's innocence, and ADA Koenderman's deliberate misleading of the jury in her closing argument, the jury convicted Huwe of murder on September 25, 1991. Huwe was sentenced to fifteen years to life in prison.

## EXONERATION

146.    Huwe Burton appealed his conviction, but the conviction was affirmed by the Appellate Division, First Department on March 18, 1993. Huwe then sought leave to appeal to the New York Court of Appeals, but his application was denied on May 24, 1993.

147.    In 2008, after decades of maintaining his innocence, Huwe obtained legal assistance in reviewing his case from attorneys and law students at the Northwestern University's Pritzker School of Law and Rutgers Law School.

148.    For several years, Huwe's legal team thoroughly reviewed Huwe's files. After interviewing numerous witnesses and reviewing hundreds of documents, Huwe's legal team found the argument for Huwe's innocence compelling.

149.    In August 2015, Huwe's legal team contacted the Bronx DA's Office and pointed out evidence indicating that Huwe's confession had been coerced and that Emanuel and Stacey Green were responsible for Mrs. Burton's murder. In light of this evidence, Huwe's legal team requested that the Bronx DA's Office retrieve the forensic evidence from Huwe's case that had been vouchered, (*see* ¶ 41 *supra*), and subject that evidence to modern DNA testing to determine whether DNA evidence could establish whether or not Emanuel and Stacey Green actually murdered Mrs. Burton. The Bronx DA's Office agreed to the request but was unable to proceed

with the investigation when the NYPD advised them that the forensic evidence from Mrs. Burton's murder could not be found.

150.   Huwe's legal team was subsequently joined by the Innocence Project. After further case development, Huwe's legal team approached the Bronx DA's Office Conviction Integrity Unit ("CIU") with the evidence they had accumulated pointing to Huwe's innocence and requested that they join them in an even more comprehensive re-investigation. The Bronx DA's Office CIU agreed.

151.   In particular, Huwe's legal team identified evidence that Huwe's "confessions" had been coerced and were not reliable. For example, they pointed out how detectives had made numerous promises to induce Huwe's "confessions," including that Huwe would be tried in Family Court and would not go to Rikers Island and prison if he confessed. Other evidence suggested that police had improperly prevented Huwe from seeing his father during the interrogation, despite repeated requests independently made by Huwe and his father to police. Additionally, evidence suggested that, despite its brevity and simplicity, Huwe's statement took 90 minutes to draft because it was difficult for Huwe to make up the details Detective Jones was directing Huwe to include. Indeed, it took so long for Detective Jones to coerce Huwe into providing the first two-and-a-half pages of fabrication that Jones directly dictated to Huwe what to put in a final one paragraph addendum.

152.   Huwe's legal team identified Emanuel Green as the actual murderer of Keziah Burton, discovering during their investigation his substantial criminal and psychiatric history and his pattern of violent criminal behavior that had begun in his later teenage years. Emanuel had committed rape, attempted robberies, and was known to criminally use the same type of weapon, a steak knife, that was used to murder Mrs. Burton. Huwe's legal team further pointed out that,

immediately after Huwe's arrest and before he had been caught possessing Mrs. Burton's stolen car, Emanuel had given false statements to the press that Huwe had showed no emotion over his mother's murder, in stark contrast to the statements Stacey had given to the police that she had consoled Huwe after he discovered his mother's body.

153.    They additionally pointed out how Emanuel gave several materially inconsistent statements to the police after being taken into custody. For example, in his written statement, Emanuel claimed Huwe pulled the knife out of Mrs. Burton's neck and wiped it on her back, leaving two bloody streaks on her house dress and causing him to run downstairs and throw up. Later, Emanuel gave a video statement in which he claimed that Huwe did not pull the knife out of Mrs. Burton's neck until after Emanuel had thrown up, and that he had seen the bloody streaks on the house dress before the knife was removed. Months later, when testifying at the grand jury seeking a superseding indictment against Huwe, Emanuel dramatically changed his story again. With regard to the murder weapon, Emanuel now claimed he was the one that removed the knife from Mrs. Burton's neck and that he had cleaned the knife by wiping it on Mrs. Burton's house dress.

154.    Huwe's legal team noted the unusually lenient treatment Emanuel had received from the police and prosecution suggested unlawful cooperation to build the false case against Huwe. Upon information and belief, despite being a parolee with a violent criminal history who had plainly lied to police and implicated himself as an accessory after the fact to murder and other serious crimes, and who was found in possession of a stolen car, no parole violation was ever filed against Emanuel. He was released on his own recognizance after testifying against Huwe at the second grand jury.

155.     They added that the arresting detective had provided contradictory testimony. Most notably, the detective falsely testified in front of the second grand jury that Huwe had admitted to participating with Green in attempting to cover-up his mother's murder. Huwe's "confessions" contained no mention of Emanuel Green.

156.     Huwe's legal team and the CIU's intensive re-investigation of Huwe's case lasted approximately two years. Among other things, Huwe's legal team and the Bronx DA's Office CIU conducted joint interviews of witnesses and obtained the sealed court file of the Coss and Parker acquittal. Huwe's legal team produced copies of the police reports contained in William Kunstler's defense file and unexpurgated copies of reports their investigators had prepared in conducting the post-conviction investigation.

157.     The Bronx DA's Office CIU also produced a copy of the prosecution's file. It was in this production that Huwe's legal team discovered for the first time the significant exculpatory evidence that had not been produced to his defense counsel, including but not limited to, photographs showing damage to the Burton family apartment door consistent with a forced entry, a complaint follow-up report documenting Ms. Bernicke's information to detectives that her earlier information had been incorrect and that Huwe had attended his first period class on the day of his mother's murder, statements signed by Stacey Green at the Mount Vernon police department after Emanuel's arrest, and ADA Koenderman's subpoena for Stacey Green's attendance records for the day of Mrs. Burton's murder, along with the response to that subpoena showing that she had lied about being at her work on the day of the incident.

158.     On January 22, 2019, after completing the joint re-investigation, the Bronx DA's Office CIU recommended that the court vacate Huwe's conviction and dismiss the charges against him pursuant to NYCPL §§ 440.10(g) and (h). After considering new scientific evidence on the

phenomena of false confessions and the particular inconsistencies and contradictions in the proof that was presented against Huwe at trial, the Bronx DA's Office decided that it no longer had confidence that Huwe's "confessions" were reliable.

159.    The CIU acknowledged that, "[o]nce detectives have made up their minds that an individual is the perpetrator it is not hard to induce a false confession, particularly from a vulnerable teenager" and that, "if credited," evidence from Huwe's *Huntley* hearing and trial testimony established that Huwe's "confessions" were the result of techniques and tactics that are unreliable and have led to false confessions. The CIU acknowledged that key evidence corroborated Huwe's testimony, such as the detectives' reliance on the erroneous information from Ms. Bernicke and language in the "confessions" indicating "the kind of mitigation explanation that police often suggest to the suspect when they are trying to convince him to say that he did it."

160.    The CIU noted that "key portions of [Huwe's] confession did not match the proven facts or physical evidence," and that "[u]pon close scrutiny" it appeared that Huwe's "account may have been contaminated because it matched information that the detectives thought was true at the time, but ultimately proved to be incorrect."

161.    It added that it was "troubling" that Huwe's "confessions" "used words and phrases that sound more like police jargon than the language a teenager would use." In contrast to the evidence corroborating Huwe's innocence, the CIU noted the absence of evidence corroborating the "confessions," which "weigh[ed] heavily" in their decision to vacate.

162.    The CIU agreed with Huwe's legal team that the detectives' involvement in the Coss and Parker case "establish[ed] that, at the same time [Huwe] confessed, the detectives were using techniques that produced false statements," thereby rendering Huwe's "confessions" "even less reliable."

163.    Observing that circumstances made Huwe particularly susceptible to the detectives' interrogation techniques, the CIU noted that Huwe was a sixteen-year-old high school student who had never been arrested before and had no experience dealing with the police. He was "raised in a strict West Indian culture that stressed the importance of having respect for authority and obeying the police." Huwe was also seriously traumatized from discovering the violent murder of his mother and was alone and without support of his father who was out of the country at the time. These circumstances "further erode[d]" the CIU's belief that Huwe's confession was reliable.

164.    The CIU also agreed with Huwe's legal team that "[Emanuel] Green's background and prior criminal history made it much more likely that [Emanuel] Green was the actual culprit of the violent attack on Mrs. Burton." Significantly, the CIU found that, after Emanuel was captured driving Mrs. Burton's car, detectives "elicited statements from Emanuel and Stacey Green that were consistent with the theory of the case the detectives had already built against [Huwe]." Yet, "[Emanuel] Green's statements to the police and the grand jury [were] riddled with inconsistencies and contradictions and, thus raise more questions than they answer."

165.    With regard to Huwe's and Emanuel's conflicting statements regarding whether the knife found at the crime scene was the murder weapon, the CIU found that the "more likely scenario is that Green got rid of the knife because it was *his* knife and that it linked him to the crime as the actual assailant."

166.    The Innocence Project filed a Motion to Vacate Conviction in the New York Supreme Court, pursuant to C.P.L §440.10(g) and (h). On January 24, 2019, Judge Steven Barrett, Justice of the Supreme Court of the State of New York, County of the Bronx heard the motion. By Order dated January 24, 2019, Justice Barrett vacated the judgements of conviction and dismissed Huwe's indictment, finding that the District Attorney had made "a compelling argument in support

of Huwe Burton's innocence" and that it was "[c]ertainly a tragedy that Huwe spent some 20 years in jail for a crime that he did not commit." Justice Barrett apologized to Huwe "on behalf of a system that failed him."

## DAMAGES

167.     Plaintiff was unlawfully imprisoned from 1992 to 2009 and spent 2,947 days from 2009 to 2017 on parole—all for a crime he did not commit.

168.     The injuries and damages sustained by Plaintiff arising from his unjust conviction and imprisonment include but are not limited to the following: loss of freedom; pain and suffering; physical injuries, including injuries from physical altercations with guards and other inmates, the worsening of injuries due to inadequate medical care, and the development of hypertension and high blood pressure; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; loss of property; legal expenses; loss of income; humiliation, indignities, and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, social activities, travel, enjoyment, and expression. As a direct result of his unjust conviction and imprisonment, many of the effects of these injuries continue to this day and will continue into the future.

169.     Huwe Burton can never regain the nearly twenty years of his life during which he was wrongfully incarcerated by the State of New York and the over eight years spent on parole. At a minimum, he deserves some measure of compensation for the time, opportunities and experiences that were taken from him and the damages he has suffered and continues to suffer as a result.

**FIRST CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Fourth and Fourteenth Amendment Malicious Prosecution**
*Against Defendant Detectives and Defendant Koenderman*

170.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

171.    Defendant Detectives and Defendant Koenderman, with malice and knowing that probable cause did not exist to arrest Huwe Burton and prosecute him for the murder of his mother, Keziah Burton, and for criminal possession of a weapon, acting individually and in concert, caused Huwe Burton to be falsely arrested, charged, and prosecuted for those crimes, thereby violating Huwe Burton's clearly established rights under the Fourth and Fourteenth Amendments of the United States Constitution to be free of unreasonable searches and seizures and to be free of prosecution absent probable cause.

172.    Specifically, these Defendants, acting individually and in concert, fabricated evidence and intentionally withheld from and misrepresented to Huwe's defense counsel, the court, grand juries, and Huwe's trial jury, exculpatory facts that vitiated probable cause against Huwe Burton and would have impeached witnesses for the prosecution at trial. (*See* ¶¶ 63–77, 83–85, 94-111, 130–138). These Defendants also deliberately failed to conduct a constitutionally adequate investigation in light of evidence clearly pointing to Emanuel and Stacey Green as responsible for Mrs. Burton's murder. (*See* ¶¶ 50–52, 94–115, 141, 144 *supra*).

173.    These Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Huwe Burton's clearly established constitutional rights. No reasonable officer in 1989 would have believed this conduct was lawful.

174.    Huwe Burton is completely innocent of the murder of his mother, Keziah Burton,

and criminally possessing a weapon. The prosecution finally terminated in Mr. Burton's favor on January 24, 2019, when the conviction was vacated and the indictment dismissed.

175.    As a direct and proximate result of these Defendants' actions, Huwe Burton spent almost twenty years wrongfully convicted and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

**SECOND CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Fourteenth Amendment Deprivation of Liberty Without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Withholding Material Exculpatory and Impeachment Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation**
*Against Defendant Detectives and Defendant Koenderman*

176.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

177.    Defendants, acting individually and in concert, deprived Huwe Burton of his clearly established constitutional right, under the Fourteenth Amendment of the United States Constitution, to a fair trial.

178.    These Defendants deprived Huwe Burton of his right to a fair trial by fabricating inculpatory evidence and intentionally using unduly suggestive interrogation procedures and/or direct suggestion and/or coercion to fabricate and obtain false witness statements inculpating Huwe Burton. (*See* ¶¶ 63–77, 83–85, 94-111, 130–138 *supra*).

179.    These Defendants deprived Huwe Burton of his right to a fair trial by withholding material exculpatory and impeachment evidence from Huwe's defense counsel and the Court. (*See* ¶¶ __ *supra*).

180.    These Defendants deprived Huwe Burton of his right to a fair trial by deliberately failing to conduct a constitutionally adequate investigation. (*See* ¶¶ 50–52, 86–89, 94–111, 141,

144 *supra*).

181.    These Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Huwe Burton's clearly established constitutional rights. No reasonable officer in 1989 would have believed this conduct was lawful.

182.     Huwe Burton is completely innocent of the murder of his mother, Keziah Burton, and criminally possessing a weapon. The prosecution finally terminated in Mr. Burton's favor on January 24, 2019, when the conviction was vacated and the indictment dismissed.

183.    As a direct and proximate result of these Defendants' actions, Huwe Burton was wrongfully convicted and imprisoned for nearly twenty years and suffered the other grievous and continuing damages and injuries set forth above.

### THIRD CAUSE OF ACTION
### 42 U.S.C. § 1983
### Failure to Intervene
*Against Defendant Detectives and Defendant Koenderman*

184.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

185.    By their conduct and under color of state law, Defendants had opportunities to intervene on behalf of Huwe Burton to prevent his false arrest, malicious prosecution, false imprisonment, and his deprivation of liberty without due process of law, but, due to their intentional conduct and/or reckless or deliberate indifference, declined or refused to do so.

186.    These Defendants' failures to intercede violated Huwe Burton's clearly established constitutional right to be free from unreasonable search and seizure and not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments. No reasonable police officer in 1989 would have believed that failing to intervene to prevent these

Defendants from fabricating inculpatory evidence, intentionally using unduly unreliable interrogation procedures and/or direct suggestion and/or coercion to obtain inculpatory statements, withholding material, exculpatory and/or impeachment evidence, deliberately failing to conduct a constitutionally adequate investigation, and causing Huwe Burton to be arrested and prosecuted without probable cause, were lawful.

187.    Huwe Burton is completely innocent of the murder of his mother, Keziah Burton, and criminally possessing a weapon. The prosecution finally terminated in Mr. Burton's favor on January 24, 2019, when the conviction was vacated and the indictment dismissed.

188.    As a direct and proximate result of these Defendants' actions, Huwe Burton was wrongfully convicted and imprisoned for nearly twenty years and suffered the other grievous and continuing damages and injuries set forth above.

### FOURTH CAUSE OF ACTION
### 42 U.S.C. § 1983
### Civil Rights Conspiracy
*Against Viggiano, Schiffman, Jones, Schappert, Maloney, Bade, ADA Koenderman, and Stacey Green*

189.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

190.    Defendants Viggiano, Schiffman, Jones, Schappert, Maloney, Bade, and ADA Koenderman, acting within the scope of their employment and under color of state law, and Defendant Stacey Green, agreed among themselves and with other individuals, including Emanuel Green, to act in concert in order to deprive Huwe Burton of his clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, and also deprived Huwe of his right to a fair trial.

43

191.    In furtherance of the conspiracy, Defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

    a.   Falsely arresting and imprisoning Huwe Burton, knowing that they lacked probable cause, (*see* ¶¶ 56–57, 63–76, 86–89 *supra*);

    b.   Fabricating inculpatory evidence in reports, statements, and pretrial communications with the prosecution, including Emanuel Green's statements inculpating Huwe Burton in the murder of his mother, (*see* ¶¶ 56–57, 63–76, 94–111 *supra*);

    c.   Committing perjury during hearings and trials, (*see* ¶¶ 81–83, 116–124, 127–128, 141–142 *supra*); and

    d.   Intentionally or with deliberate indifference failing to comply with their duty to disclose *Brady* material during the pendency of the case, (*see* ¶¶ 112–115, 130–139, 145–146 *supra*).

192.    Huwe Burton is completely innocent of the murder of his mother, Keziah Burton, and criminally possessing a weapon. The prosecution finally terminated in Mr. Burton's favor on January 24, 2019, when the conviction was vacated and the indictment dismissed.

193.     As a direct and proximate result of Defendants' actions, Huwe Burton was wrongfully convicted and imprisoned for nearly twenty years and suffered the other grievous and continuing damages and injuries set forth above.

**FIFTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Coercion**
*Against Viggiano and Jones*

194.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

195.    Defendant Detectives Viggiano and Jones intentionally isolated Mr. Burton, who was only sixteen years old and found himself in his first police encounter. These defendants then engaged in, *inter alia*, a deliberate course of lies, deception, coercion, threats of dire consequences if Huwe did not cooperate, and false assurances of leniency and beneficial assistance if he cooperated.

196.    As a result of these defendants improper and coercive tactics, Huwe's will was overborn and defendants caused Huwe to create a "confession" state that falsely incriminated himself in violation of his clearly established Fifth and Sixth Amendment right to be free from compelled self-incrimination and to be afforded access to counsel.

197.    Huwe Burton is completely innocent of the murder of his mother, Keziah Burton, and criminally possessing a weapon. The prosecution finally terminated in Mr. Burton's favor on January 24, 2019, when the conviction was vacated and the indictment dismissed.

198.     As a direct and proximate result of Defendants' actions in coercing false and unreliable evidence to be used against him at trial, Huwe Burton was wrongfully convicted and imprisoned for nearly twenty years and suffered the other grievous and continuing damages and injuries set forth above.

## SIXTH CAUSE OF ACTION
### 42 U.S.C. § 1983
### Supervisory Liability
*Against Sergeant Viggiano, Captain Casey,*

199.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

200.    The individual defendant police officers, and/or detectives Schiffman, Jones, Schappert, Maloney, and, acted with impunity in an environment in which they were not adequately trained, supervised, or disciplined by Defendant Sergeant Viggiano, Captain Casey,

and other supervisors, in this case and as a matter of practice.

201. Defendants Sergeant Viggiano, Captain Casey, and other supervisors acted with gross negligence, recklessness, and/or deliberate indifference to the constitutional rights of citizens by failing to provide adequate training, supervision, and discipline of the defendant police officers, and thereby caused the individual defendant police officers to deprive Huwe Burton of his clearly established constitutional rights, including his rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, and to a fair trial.

202. Had Defendants Sergeant Viggiano, Captain Casey, and other supervisors not provided grossly inadequate training, supervision, and discipline of the defendant police officers, these defendants would not and should not have used unduly unreliable interrogation procedures and/or direct suggestion and/or coercion to obtain fabricated inculpatory evidence, committed perjury, withheld exculpatory and impeachment evidence, and intentionally and maliciously caused Huwe Burton to be arrested and prosecuted without probable cause. Defendants Sergeant Viggiano, Captain Casey, and other supervisors were directly involved in the investigation of Huwe Burton and directly supervised the specific investigative acts taken by the individual police officer defendants in this case.

203. The grossly negligent, reckless, and/or deliberately indifferent conduct of Defendants Sergeant Viggiano, Captain Casey, and other supervisors under color of state law violated their clearly established duty, in 1992, to supervise defendants Schiffman, Jones, Schappert, Maloney, and Bade, and no reasonable police supervisor in 1989 would have believed that grossly negligent, reckless, and/or deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinate officers was lawful.

204.    Huwe Burton is completely innocent of the murder of his mother, Keziah Burton, and criminally possessing a weapon. The prosecution finally terminated in Mr. Burton's favor on January 24, 2019, when the conviction was vacated and the indictment dismissed.

205.    As a direct and proximate result of these Defendants' actions, Huwe Burton was wrongly convicted and imprisoned for nearly twenty years and suffered the other grievous and continuing damages and injuries set forth above.

### SEVENTH CAUSE OF ACTION
#### 42 U.S.C. § 1983
#### *Monell* Claim
*Against Defendant City of New York for the Actions and Omissions of the Bronx DA's Office*

206.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

207.    Beginning on or about January 6, 1989, members of the Bronx DA's Office, including ADA Koenderman, violated Mr. Burton's constitutional rights and his resultant injuries were directly, foreseeably, proximately, and substantially caused by conduct chargeable to a de facto policy, custom or practice on the part of the Defendant City, amounting to deliberate indifference to the constitutional rights of persons, including Mr. Burton, subject to prosecution by the Bronx DA's Office, namely:

   a.  The Bronx DA's Office's institution and implementation of plainly inadequate or unlawful policies, procedures, regulations, practices, and customs concerning:

      i.  The duty not to initiate a criminal prosecution that is not based on probable cause;

ii. The duty not to create or to otherwise use false, misleading or unreliable evidence, testimony, statements or arguments during criminal proceedings;

iii. The obligation to correct false, inaccurate, incomplete or misleading evidence, testimony, statements and argument whenever such misconduct is discovered to have occurred;

iv. The continuing obligation to timely and fully disclose material favorable to the defense as set forth in *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 450 U.S. 150 (1972), and progeny; and

v. Knowingly making false and misleading arguments during summation.

b. The Bronx DA's Office's deliberate indifference to the need (of which it has failed) to adequately instruct train, supervise, and discipline its employees with respect to such matters.

208.    The aforesaid deliberate or de facto policies, procedures, regulations, practices and customs, including the failure to properly instruct, train, supervise, and discipline employees with regard thereto, were implemented or tolerated by policymaking officials for Defendant City, including the Bronx County District Attorney and his delegates, who knew:

a. To a moral certainty that such policies, procedures, regulations, practices and customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

b.  That such issues present employees with difficult choices of the sort that instruction, training, supervision, and discipline will make correct choices less difficult and incentivize making correct choices;

c.  That the making of wrong choices by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause him or her constitutional injury; and

d.  That employees of the Bronx DA's Office had a long history of making wrong choices in such matters.

209.   The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraph, based upon:

a.  Numerous credible allegations, many of which were substantiated by judicial decisions (some of which are listed in Exhibit A, attached hereto and incorporated by reference), that the Bronx DA's Office ADAs had:

   i.   Participated in the manufacturing of false testimony or evidence;

   ii.  Presented or failed to correct false or misleading testimony and argument;

   iii. Failed to disclose information favorable to the defense that was required to be disclosed by the Constitutions and the laws of the United States and of the State of New York; and

b.  The inherent obviousness of the need to train, supervise, and discipline ADAs in their aforementioned constitutional obligations to counteract the inherent pressure on prosecutors to obtain convictions.

210.    At the time of Plaintiff's prosecution, the Bronx County District Attorney's indifference to the aforementioned types of prosecutorial misconduct was evidenced by his failure to: conduct internal disciplinary investigations; discipline the prosecutors who were known to engage in such misconduct (including the prosecutors responsible for the misconduct found in the judicial decisions listed in Exhibit A); or refer such individuals for possible discipline by the Appellate Division's Disciplinary or Grievance Committees.

211.    Instead of disciplining such prosecutors for the aforementioned types of prosecutorial misconduct, the Bronx County District Attorney's policy, custom, or practice was to give them raises, promotions and commendations, based in part on their record of securing indictments, winning at trial and extracting guilty pleas, even in weak cases or cases (like Mr. Burton's) where reasonable grounds did not exist to believe the defendant committed the offense charged.

212.    Thus, prosecutors were incentivized to violate the constitutional rights of criminal defendants, since they knew they were likely to be rewarded for winning but would suffer no negative consequences if it ever became known that they were violating the rights of the defendants they were prosecuting.

213.    Further encouraging prosecutors to win at any cost was their knowledge that the Bronx DA's Office had no employee handbook or other published procedure for disciplining prosecutors who violated rules of behavior for criminal prosecutions.

214.    Indeed, prosecutors were emboldened to violate basic constitutional provisions protecting criminal defendants' constitutional right to a fair trial by their knowledge that the Bronx County District Attorney's was willing to pursue or tolerate policies, customs, and practices that brazenly violated criminal defendants' fundamental constitutional rights.

215.    Evidence of the Bronx County District Attorney's deliberate indifference to prosecutorial misconduct violative of a criminal defendants' constitutional rights, including the making of false or misleading arguments to a jury, and withholding information favorable to the defense was uncovered during the civil rights litigation in *Ramos v. City of New York*, 285 A.D.2d 284 (1st Dept 2001), a case involving the wrongful conviction of a young man due to the knowing use of false evidence and argument and *Brady* violations. During that litigation, discovery of Bronx DA's Office personnel records, together with deposition testimony, showed that in approximately 72 cases where courts had found prosecutorial misconduct occurred (including the use of and failure to correct false or misleading testimony and *Brady* violations), officials could only identify one prosecutor from between 1975 and 1996 who had been disciplined in any respect for misbehavior while prosecuting a criminal case. Discovery also revealed that that the Bronx DA's Office had no meaningful disciplinary policy, procedure, training, or practice: and that the Bronx DA's Office trained prosecutors in blatantly unlawful practices to prevent disclosure of evidence favorable to criminal defendants under *Brady*.

216.    Further evidence of the Bronx County District Attorney's deliberate indifference to prosecutorial misconduct was uncovered in the companion lawsuits *Poventud v. City of New York,* 07 Civ. 3998 (DAB)(THK) (U.S.D.C. S.D.N.Y.) and *Maldonado v. City of New York*, No. 17568-2004 (N.Y. Sup. Ct. Bronx Co. filed June 14, 2004), which also involved the knowing use of false evidence and argument and committing *Brady* violations by the Bronx DA's Office. Counsel in these cases reviewed personnel files for Bronx DA's Office cases where prosecutor misconduct had been found from between 1989 through 2006 and did not discover any documentary evidence of disciplinary action ever being taken against the prosecutors.

51

217.   The discovery obtained in the *Ramos, Poventud,* and *Maldonado* lawsuits is summarized in Joel B. Rudin, *The Supreme Court Assumes Errant Prosecutors Will Be Disciplined by Their Offices or the Bar: Three Case Studies That Prove That Assumption Wrong*, 80 Fordham L. Rev. 537, 544-558 (2011) (copy attached as Exhibit B), which is incorporated herein by reference. Notwithstanding the disclosure and recognition of the unconstitutional prosecutorial practices of the Bronx DA's Office that resulted from those cases, the Bronx County District Attorney's deliberately indifferent policies, customs, and practices continued.

218.   The Bronx County District Attorney's policy, custom and practice of approval and/or ratification of, toleration and/or acquiescence in, or deliberate indifference to violations of his Office's constitutional obligations foreseeably encouraged such violations to continue and was a substantial cause of the violations of Mr. Burton's constitutional rights beginning with the initiation of a criminal prosecution against him without probable cause and continuing throughout his criminal proceedings and trial.

219.   The aforesaid policies, procedures, regulations, practices, and customs of Defendant City were collectively and individually a substantial factor in bringing about the aforesaid violations of Mr. Burton's rights under the Constitution and Laws of the United States and in causing his damages.

220.   Under the principles of municipal liability for federal civil rights violations, the Bronx County District Attorney (or his authorized delegates) has final managerial responsibility for training, instructing, supervising, and disciplining attorneys and other employees in his office regarding their conduct in the prosecution of criminal matters, including but not limited to, their obligations not to elicit or manufacture false or unreliable "evidence," to make timely disclosure of exculpatory evidence to the defense, to refrain from offering false or misleading evidence,

testimony mad argument during pretrial and trial proceedings, and to correct such false or misleading evidence, testimony, and argument when they become aware of it.

221.    The Bronx County District Attorney, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline with respect to his Office's performance of its duties.

222.    The Bronx County District Attorney, at all relevant times, was and is an elected officer of Bronx County, one of the constituent counties of Defendant City; the Office was and is funded out of the City's budget; and the Office was and is a New York City agency.

223.    The Bronx County District Attorney was and is designated a "local officer," rather than a "state officer," under New York Public Officers Law § 2; New York has provided by statute (New York County Law §§ 53, 941) that Defendant City's constituent counties (including Bronx County), and hence Defendant City has liability for torts committed by County officers and employees, such as the Bronx County District Attorney and his assistants, and Defendant City represents such officers and employees in judicial proceedings and indemnifies them because they are City officials.

224.    The Bronx County District Attorney personally and/or through his authorized delegates, at all relevant times, had final authority and constituted a City policymaker for whom the City is liable, with respect to the above-mentioned areas.

225.    During all times material to this Complaint, the City, through its policymakers, owed a duty to the public at large and to Mr. Burton, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by their

subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

226.    By virtue of the foregoing, Defendant City is liable for having substantially caused the foregoing violations of Mr. Burton's constitutional rights and his resultant injuries.

### EIGHTH CAUSE OF ACTION
*Monell* Claim for the Unconstitutional NYPD Custom or Policy
of Failing to Adequately and Faithfully Account for and Preserve Forensic Evidence
in the City's Possession Under *Newton v. City of New York*
*Against Defendant City of New York*

227.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

228.    The City of New York, by and through its final policymakers, maintained a custom, policy, or practice of withholding or destroying forensic crime scene evidence sought by inmates for post-conviction DNA testing.

229.    The City of New York, by and through its final policymakers, also maintained a custom, policy or practice of failing to train and supervise its employees who were custodians of forensic crime scene evidence sought by inmates for post-conviction DNA testing on how to maintain such evidence.

230.    These customs, policies or practices were the moving force behind the violation of Huwe Burton's Fifth and Fourteenth Amendment rights to a fair trial, not to be deprived of liberty without due process of law, and of access to the courts.

231.    As a direct and proximate result of Defendant's deficient evidence management system and/or grossly negligent, reckless, or deliberately indifferent failure to adequately and faithfully account for, preserve, and/or turn over forensic crime scene evidence in the City's possession to Huwe Burton for use in his appeals, Mr. Burton was prevented from vindicating his

liberty interest in demonstrating his innocence, in violation of his Fourteenth Amendment right to due process.

232.    Defendant's customs, policies or practices caused wrongful conduct, including, without limitation, the failure to locate the victim's clothing, fiber and hair that was found on or about the victim, a telephone cord that was wrapped around the victim's wrist, a kitchen knife found at the crime scene, a rug swatch and door lock assembly that were removed from the crime scene, and several other objects belonging to the victim, which remains in NYPD custody but has yet to be located or disclosed. The City lacked proper procedures to ensure adequate maintenance and preservation of this evidence, and/or to ensure that it was accessible to Mr. Burton during his appeals and subsequent court proceedings.

233.    As a direct and proximate result of Defendants' actions, Huwe Burton spent additional years wrongly convicted and imprisoned, continues to be unable to scientifically prove his innocence, and suffered the other grievous and continuing damages and injuries set forth above.

**WHEREFORE**, Plaintiff, Huwe Burton, prays as follows:

a.    That the Court award compensatory damages to him and against the defendants, jointly and severally, in an amount to be determined at trial;

b.    That the Court award punitive damages to him against all individual defendants, in an amount to be determined at trial, that will deter such conduct by defendants in the future;

c.    For a trial by jury;

d.    For pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

e.      For any and all other relief to which he may be entitled.

Dated:      New York, New York
            October 28, 2020

                                    BELDOCK LEVINE & HOFFMAN LLP

                                    By:_____
                                        Jonathan C. Moore
                                        Luna Droubi
                                        Marc A. Cannan
                                        Marc Arena

                                    99 Park Avenue, 26th Floor
                                    New York, New York 10016
                                    (212) 490-0400

                                    *Attorneys for Plaintiff Huwe Burton*