```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _9/26/2022__
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
HUWE BURTON,                                       :
                                                   :
                              Plaintiff,           :          20-CV-9025 (AT) (RWL)
                                                   :
                                                   :     **REPORT AND RECOMMENDATION**
            - against -                            :       **TO HON. ANALISA TORRES:**
                                                   :         **DEFAULT JUDGMENT**
CITY OF NEW YORK et al.,                            :
                                                   :
                              Defendant.           :
------------------------------------------------------------X

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

On January 24, 2019, the New York Supreme Court vacated a conviction that
wrongfully sent Plaintiff Huwe Burton to prison for almost 20 years for a heinous crime he
did not commit:  murdering his own mother when Burton was only 16 years old.  While
trying to piece his life back together after gaining his freedom, Burton filed this action
pursuant to 42 U.S.C. § 1983 against the City of New York (the "City"), detectives of the
New York Police Department ("NYPD"), and the prosecuting assistant district attorney
("ADA") (collectively, "individual City defendants"), for violating, and conspiring to violate,
his constitutional rights.  Burton and the City, as well as all individual City defendants,
eventually reached a settlement for Burton to receive a portion of what he claimed in
monetary damages.  Only one defendant remains in the case – Stacey Blocker a/k/a
Stacy Green ("Green" or "Stacey Green").  Green failed to appear in the action and has
not responded to notifications and warnings of default.  Accordingly, Burton now moves
for default judgment and an award of damages against Green pursuant to Federal Rule
of Civil Procedure 55 ("Rule 55").  For the reasons set forth below, I recommend that the

Court grant the motion for default judgment and award Burton damages in the amount of $19 million and post-judgment interest.

## FACTS[1]

The facts of this case exemplify all too well a serious and tragic miscarriage of justice in which the judge who vacated Burton's conviction acknowledged that the "system … failed him."  (First Amended Complaint ("Compl.") ¶ 167.[2])

## A.    The Murder Of Burton's Mother

On January 3, 1989, Burton was 16 years old.  (Compl. ¶ 33.)  That morning, at approximately 7:45 am, Burton said goodbye to his mother, Keziah Burton, and left for school, arrived there around 8:05 a.m., and remained at school until about 1:35 p.m.  (*Id.* ¶¶ 33-34.)  Later that afternoon, Burton returned home and found his mother dead and bloodied in her bedroom, having been stabbed and murdered with a knife.  (¶¶ 36, 40.) The time of death was approximately 11:45 a.m., when Burton was at school.  (¶ 43.) Although Ms. Burton lay murdered in her bed, her car was missing.  (¶ 35.)

## B.    Green Lies, And The Police Obtain A Coerced Confession From Burton

A month before the murder, the Burtons rented their downstairs apartment to Emanuel Green and his common-law wife Stacey Green.  (¶ 51.)  The Greens had

---

[1] The facts are drawn from the First Amended Complaint (Dkt. 9) ("Compl."); the Declaration of Huwe Burton, dated February 7, 2022 (Dkt. 89-11) ("Burton Decl."); the Declaration of Marc Arena, Burton's attorney, dated February 7, 2022 (Dkt. 89) ("Arena Decl."); the Supplemental Declaration of Marc Arena, dated August 24, 2022 (Dkt. 107) ("Supp. Arena Decl."); and all exhibits thereto.

[2] Unless otherwise indicated, all paragraph references in the Fact section are to the First Amended Complaint.  Where a citation appears following multiple sentences, the citation collectively supports each of those preceding statements.

financial problems, and both had been arrested for assaulting and menacing their prior landlord before moving into the Burtons' apartment building.  (¶ 53.)  At the time of the murder, Emanuel Green was on parole for rape and robbery.  (¶ 53.)

The police suspected that the murder of Ms. Burton had been an "inside job" committed by someone with access to the apartment building.  (¶ 44.)  One of the witnesses interviewed was Stacey Green.  Green lied to the police, falsely stating that she left for work at 8:10 a.m. that morning, that she had seen Burton's mother at that time and had briefly exchanged words, saying she would speak with Ms. Burton later because she was running late, and then left in a cab.  (¶ 51.)  Green also lied that Emanuel Green had left for work that morning.  (¶ 101.)  As it turned out, neither Stacey Green nor her husband went to work that day.  (¶ 53.)  The police learned none of the evidence that would have led them to suspect the Greens at the outset of the case, however, because they did not, at the time, attempt to corroborate the Greens' information or run a criminal background check.  (¶ 53.)

Instead, the police trained their sights on Burton, the victim's 16-year-old son with no criminal history, and conducted a lengthy coercive interrogation filled with threats, lies, and made up facts.  (¶¶ 44, 64-74.)  Among other things, the detectives prevented Burton from seeing his father (¶ 67); told Burton that he was guilty of statutory rape for having sex with his minor girlfriend and would be sent to Rikers (¶ 66); pressured Burton to adopt a concocted story that he accidentally killed his mother while on crack (¶¶ 68, 70); and assured Burton that if he adopted such a story, he would be sent to Family Court to be released to his father instead of going to Rikers and spending the rest of his life in prison

(¶ 68).  Ultimately broken and unable to resist the detective's coercion, Burton "confessed" to the crime.  (¶¶ 71-74.)

Less than three months earlier, the same detectives who coerced Burton's confession, engaged in similar tactics to coerce false confessions from two other young men that they had participated in the murder of a security officer.  (¶ 61.)

## C.    The Police Ignore Alibi Evidence; Green Lies Again

In January 1989, Burton's case proceeded to the grand jury at which one of detectives that had coerced Burton's confession testified to the contents of that confession.  (¶¶ 82-86.)  While the grand jury was still hearing evidence, the detectives learned that their basis for initially suspecting Burton of his mother's murder was ill-founded.  Whereas one of Burton's teachers initially had incorrectly informed the police that Burton had not attended his first-period class the day of the murder, the teacher came forward and informed the detectives that she had been mistaken and that Burton in fact had attended his first-period class.  (¶¶ 55, 87.)  That information was significant because it confirmed what Burton told the detectives and provided an alibi for Burton that he was not home at the time of the murder. (¶ 89.)

The detectives then immediately re-interviewed Green.  Once again, Green falsely told the police that she had seen and spoken to Burton's mother at 8:10 a.m. as Green was leaving for work on the day of the murder.  (¶ 91.)

Neither the detectives nor the assistant district attorney handling the case informed the grand jury of the new evidence essentially exculpating Burton.  (¶¶ 92-94.)  As a result, the grand jury indicted Burton for the murder of his mother.  (¶ 94.)

**D.      Police And The Greens Agree To Concoct A False Story**

Just hours after the grand jury indictment, detectives found Ms. Burton's stolen car with Emanuel Green at the wheel.  Emanuel did not have an innocent explanation for possessing Ms. Burton's car.  (¶ 95.)  The detectives also learned that Emanuel worked nights and had lied about going to work on the morning of Ms. Burton's murder. (¶ 96.) The detectives thus recognized that Emanuel Green, not Burton, likely was the murderer. Similarly, the detectives recognized that the evidence pointed to Stacey Green being, at minimum, an accomplice to Ms. Burton's murder.  She had repeatedly lied to the detectives about her and Emanuel's whereabouts the morning of the murder and withheld information that Emanuel was in possession of Ms. Burton's stolen car.  (¶ 101.)

The detectives realized that this new information would lead to the unraveling of their coercion of Burton's confession and put their careers in jeopardy.  So, rather than pursue the role of Green and her husband's roles in the murder of Ms. Burton, the police ignored the evidence and proceeded to further manufacture the case against Burton. (¶ 103.)  The Greens were an integral part of that plan.

In exchange for leniency, Green and her husband cooperated with the police and adopted a false narrative prepared by the detectives.  (¶¶ 104-05.)  The statement prepared for Emanuel was that after Burton murdered his mother, he asked for Emanuel's help; Emanuel helped by making the murder look like a rape and robbery; and Emanuel took Ms. Burton's car to sell and split the proceeds with Burton.  (¶ 106.)  The statement prepared for Stacey Green falsely stated that she had gone to work the morning of the murder and did not learn until later in the week that that Emanuel had helped Burton.  (¶ 107.)  In return for the Greens' cooperation, Emanuel Green was charged with only

possession of stolen property and hindering a prosecution and was not taken into custody for violating his parole.  Stacey Green was not charged with any crime.  (¶ 109.)

Immediately following Burton's indictment, his defense counsel requested production of the prosecution's file concerning Emanuel Green's arrest.  The ADA refused and falsely represented that the information was not relevant.  (¶ 113.)  When Burton's lawyer and the ADA later entered into an agreement for disclosure of exculpatory and other material, the ADA did not turn over material information, including a report documenting the corrected information provided by Burton's teacher that Burton had attended his first period class, documents concerning the Greens related to Emanuel Green's arrest, and photographs showing signs of forced entry to Burton's apartment on the day of the murder.  (¶¶ 114-15.)

In August 1989, the ADA convened a second grand jury seeking a superseding indictment against Burton to include additional charges.  (¶ 116.)  The ADA elicited false testimony from Emanuel Green that Burton committed the murder, even though that testimony included key facts that were inconsistent with what Emanuel Green had testified to at the first grand jury.  (¶¶ 119-21.)  The ADA also elicited false testimony about Burton from the same detective who testified at the first grand jury.  (¶ 123.)  The second grand jury indicted Burton on the additional charges.  (¶ 124.)

**E.    The ADA Conceals Evidence Of Stacey Green's Lies Before And At Trial**

In March 1990, the ADA received subpoenaed work records for Stacey Green on the day of the murder.  The records showed that Green did not go to work that day, thus demonstrating both that Green had repeatedly lied to the police and that Emanuel Green

had perpetuated the same lie.  (¶¶ 131-32.)  The ADA, however, withheld the evidence from Burton's defense counsel and the Court.  (¶ 134.)

Burton was tried for the murder of his mother in September 1991.  Once again, the ADA elicited false testimony about Burton's coerced confession and withheld exculpatory information that would have established that the Greens, not Burton, had murdered his mother.  (¶¶ 140-42.)  The jury convicted Burton on September 25, 1991.  He was sentenced to fifteen years to life in prison.  (¶ 146.)  The conviction was affirmed on appeal.  (¶ 147.)  Throughout his ordeal, Burton maintained he was innocent.  (¶ 148.)

**F.   Almost 18 Years Later, Burton Is Exonerated**

In 2008, Burton obtained legal assistance from attorneys and law students at the Northwestern University's Pritzker School of Law and Rutgers Law School.  (¶ 148.) Lawyers from the Innocence Project also joined his team.  (¶ 151.)  Based upon evidence uncovered over a period of years, Burton's legal team requested that the Bronx District Attorney's Office Conviction Integrity Unit ("CIU") conduct a comprehensive re-investigation.  The CIU agreed.  (¶ 151.)

Those investigative efforts led to extensive evidence of the many transgressions by the police and the ADA that secured Burton's conviction, including, among others:  the circumstances of the police interrogation of Burton and the tactics that coerced him to confess falsely; Emanuel Green's criminal and psychiatric history – including rape and robbery committed using the same type of knife that was used to murder Ms. Burton; evidence of multiple inconsistent statements provided by Emanuel Green; and the unusual leniency shown to Emanuel Green despite being on parole when found in possession of Ms. Burton's stolen car.  As part of the investigation, Burton's team also

7

obtained the prosecution file containing exculpatory evidence that was never disclosed, such as photographs demonstrating forced entry of the Burton apartment; the corrected information provided by Burton's teacher that he had in fact been present in school during first period; statements signed by Stacey Green at the police department after Emanuel Green's arrest; and the subpoenaed work records showing that Stacey Green lied about being at work on the day of the murder.  (¶¶ 152-58.)

On January 22, 2019, the CIU recommended that the court vacate Burton's conviction and dismiss the charges against him.  (¶¶ 159-66.)  Two days later, the Innocence Project filed a motion to vacate Burton's conviction, which the court granted that same day.  In vacating the judgment, the court found that "a compelling argument in support of Huwe Burton's innocence" had been made and that it was "[c]ertainly a tragedy that Huwe spent some 20 years in jail for a crime he did not commit."  (¶ 167.)

## G.    Burton's Harm

Burton spent approximately nineteen years, ten months in prison and jail as a result of being wrongfully arrested for and convicted of murdering his mother.  (Burton Decl. ¶ 8.)  Of that time, Burton was incarcerated at Rikers Island for approximately two years, four months, and in New York State prison for approximately seventeen years, six months.  (*Id.*)  Following his incarceration, Burton was subject to restrictions for more than eight years while on parole.  (*Id.*; *see also* Compl. ¶ 168.)

Burton has suffered economic loss as a result of his wrongful arrest and imprisonment.   Nora Ostrofe, an expert economist retained on behalf of Burton, determined that, for the period during which he was incarcerated and on supervised release – age 19 to 46 – Burton suffered an economic loss due to lost earnings in an

amount of $1,668,282.  (*See* Expert Report of Nora Ostrofe (attached as Arena Decl. Ex. 9) ("Ostrofe Report").)

In addition to economic loss, as a result of his incarceration, Burton experienced substantial loss of liberty and restrictions on freedoms that are basic to life, liberty, and the pursuit of happiness, such as diet, sleep, human contact, social activity, family relations, educational opportunity, vocational opportunity, athletic opportunity, sexual activity, travel, and more.

Burton also suffered physical attacks.  While at Rikers early on, officers allowed other inmates to beat Burton – "at least two to three times weekly for months on end." (Burton EBT 217-18.[3])  When Burton fought back, he was placed in solitary confinement. (*Id.* 217.)  He was ostracized among the prison community "because of why I was there," presumably referring to his allegedly murdering his own mother.  (*Id.* 220.)  He did not, however, experience any serious medical issues or injuries at any time during his time in prison.  (*Id.* 201.)

Much of Burton's injury and damage has lasting effects that continues and likely will continue until the end of Burton's life.  For instance, commenting on his notoriety on the internet, Burton lamented "you punch my name in … it always leads with that first … A lot of times it doesn't matter how old I get or how many different things I do, it's always going to be that thing on me."  (*Id.* 208.)  As a consequence, people "would pull back opportunities … and … certain people would not pick up the phone."  (*Id.*)

---

[3] "Burton EBT" refers to the transcript of the Examination Before Trial of Huwe Burton, Nov. 3, 2021, attached as Exhibit 1 to the Supplemental Arena Declaration.

The series of events has "torn [apart] every bit of family life that I have ever known; it has torn apart, everything that I was taught.  I lost – I lost everything." (*Id.* 227.)  He did not get a chance to "really grieve my mom" until after he was released.  (*Id.* 228.)  He not only was wrongly marked for having murdered his mother, he also lost his father, who "g[a]ve everything that he had to make sure that I even had a proper defense" and died before knowing that his son had been exonerated.  (*Id.* 227.)

Burton readily admits that he has been "healing" from a lot of what transpired.  (*Id.* 228.)  And, since being released, Burton has not received or sought professional psychological counseling or services.  (*Id.* 206-07.)  Nor has he experienced difficulty sleeping or maintaining relationships.  (*Id.* 209-10.)  But as Burton put it simply, "you never get past it."  (*Id.* 229.)  "I lost a lot, and again, whatever pieces that I can … pick up and put back together, I will.  There are some things that I just – you know, I can never put back together, I just have to deal with."  (*Id.*)

## PROCEDURAL HISTORY

The Court has both subject matter jurisdiction over this case and personal jurisdiction over Green.  The Court has subject matter jurisdiction pursuant 28 U.S.C. §§ 1331 (claims based on federal law) and 1343(a)(3), (a)(4) (civil rights claims), and supplemental jurisdiction over related state law claims pursuant to 28 U.S.C. § 1367(a).  The Court has personal jurisdiction over Green based on her being a citizen and resident of City of New York.  (Compl. ¶ 30.)

Burton commenced the case by filing his Complaint on October 28, 2020.  (Dkt. 1.)  He filed a First Amended Complaint on November 2, 2020.  (Dkt. 9.)  Among other defendants, Green was duly served with a summons and other papers by personal

service upon a co-tenant on November 12, 2020, and mail delivery to Green's address on November 13, 2020.  (Dkt. 34.)  While other defendants answered the First Amended Complaint, Green did not.  To the contrary, she did not appear in the case at any time, ignoring not only court filings and orders, but also correspondence from Burton's counsel advising Green of conference dates and her being in default.  (Arena Decl. ¶¶ 12-13 and Exs. 4-5.)

The following year, Burton and the defendants who had appeared engaged in settlement discussions.  The negotiations culminated in an agreement, pursuant to which New York City agreed to pay Burton a sum of $11 million, and Burton agreed to discontinue his claims against the City defendants, which occurred on October 4, 2021. (Dkt. 75; *see also* Arena Decl. ¶¶ 2, 15-16.)  At that juncture, Green became the sole remaining defendant in the action.  (*See* Arena Decl. ¶ 17.)

On October 27, 2021, Burton applied for, and the Clerk of Court entered, a certificate of default as to Green.  (Dkt. 79-80.)  Burton then moved for entry of default judgment against Green.  (Dkt. 87-89.)  On February 16, 2022, the Court issued an order requiring Green to file a written response by March 21, 2022, and to appear for a hearing on March 31, 2022 to show cause why default judgment should not be entered against her.  (Dkt. 91.)  Burton duly served Green with the order to show cause and other papers by certified mail as directed in the order to show cause.  (Dkt. 92.)

Green did not file any written response to the order to show cause and did not appear for the March 31, 2022 hearing.  On April 27, 2022, the Court issued an order directing Burton to submit additional briefing and evidence on damages by June 27, 2022 and requiring any responding papers to be filed by July 27, 2022.  (Dkt. 95.)  Burton duly

served the order on Green by certified mail on April 28, 2022.  (Dkt. 96.)  Following multiple extensions of time (*see* Dkt. 97-105), Burton timely filed his supplemental briefing and evidence on August 24, 2022 (Dkt. 106-07), and served them on Green by certified mail on August 25, 2022 (Dkt. 108).[4]  Once again, Green did not file any response.

## LEGAL STANDARDS

When a party seeking judgment or affirmative relief shows by affidavit that the opposing party has failed to plead or otherwise defend, the Clerk of Court must enter a default.  Fed. R. Civ. P. 55(a).  The non-defaulting party may then apply to the court to obtain default judgment.  Fed. R. Civ. P. 55(b).

"In determining whether to grant a motion for default judgment, a court within this district considers three factors: '(1) whether the defendant's default was willful; (2) whether defendant has a meritorious defense to plaintiff's claims; and (3) the level of prejudice the non-defaulting party would suffer as a result of the denial of the motion for default judgment.'"  *Nespresso USA, Inc. v. Africa America Coffee Trading Co. LLC*, No. 15-CV-5553, 2016 WL 3162118, at *2 (S.D.N.Y. June 2, 2016) (quoting *Indymac Bank, F.S.B. v. National Settlement Agency, Inc.*, No. 07-CV-6865, 2007 WL 4468652, at *1 (S.D.N.Y. Dec. 20, 2007)); *Mason Tenders District Council v. Duce Construction Corp.*, No. 02-CV-9044, 2003 WL 1960584, at *2 (S.D.N.Y. Apr. 25, 2003).  Ultimately, the entry of a default judgment is entrusted to the sound discretion of the district court.  *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95 (2d Cir. 1993).

---

[4] Burton also filed a letter stating that he does not seek to recover attorney's fees as against Defendant Green in this matter.  (Dkt. 111.)

The court also "must determine whether the plaintiff has pleaded facts supported by evidence sufficient to establish the defendant's liability with respect to each cause of action." *Nespresso USA*, 2016 WL 3162118 at *2; *accord Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009) ("[A district court] is also required to determine whether [plaintiff's] allegations establish [defendant's] liability as a matter of law").  "It is an ancient common law axiom that a defendant who defaults thereby admits all well-pleaded factual allegations contained in the complaint." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011) (internal quotation marks omitted).  A factual allegation will be deemed not well-pled "only in very narrow, exceptional circumstances." *Ideavillage Products Corp. v. Bling Boutique Store*, No. 16-CV-9039, 2018 WL 3559085, at *2 (S.D.N.Y. July 24, 2018) (internal quotation marks and citation omitted).  That said, a court "must still satisfy itself that the plaintiff has established a sound legal basis upon which liability may be imposed." *Jemine v. Dennis*, 901 F. Supp. 2d 365, 373 (E.D.N.Y. 2012) (citing *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981)).

Once liability is determined, the plaintiff bears the burden of establishing an amount of damages with reasonable certainty.  *RGI Brands LLC v. Cognac Brisset-Aurige, S.A.R.L.*, No. 12-CV-1369, 2013 WL 1668206, at *6 (S.D.N.Y. April 18, 2013) (collecting cases), *R. & R. adopted*, 2013 WL 4505255 (S.D.N.Y. Aug. 23, 2013); *see also Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir. 1997).  In conducting an inquest on damages, the court is charged with "'determining the proper rule for calculating damages on such a claim, and assessing plaintiff's evidence supporting the damages to be determined under this rule.'"  *Tiffany (NJ) Inc. v. Luban*, 282 F. Supp. 2d 123, 124 (S.D.N.Y. 2003) (quoting *Credit Lyonnais*

*Securities (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999)).  Further, the damages award on a default judgment "must not differ in kind from, or exceed in amount, what is demanded in the pleadings."  Fed. R. Civ. P. 54(c).

In determining damages after default judgment, the Court need not hold a hearing and may rely on affidavits, documentary evidence, and other evidence "as long as it ensured there was a basis for the damages specified in the default judgment." *Transatlantic Marine Claims Agency, Inc.*, 109 F.3d at 111.

## DEFAULT JUDGMENT

Default judgment against Green is warranted.  First, Green willfully defaulted.  She never appeared in the action.  She did not respond to the First Amended Complaint.  She ignored Plaintiff's written warning that she was in default and would be subject to default judgment.  She did not appear for the show cause hearing that provided her with an opportunity to avoid default.  And she has not responded to any filings concerning damages.  Second, there is no evidence before the Court to suggest that Green has a meritorious defense.  Third, denying Burton's motion for default judgment would be prejudicial to Burton because he would be left without recourse with respect to Green's liability and recovery of any damages that may be apportioned to Green that were not included in settlement with the other defendants.

## LIABILITY

The facts establish Green's liability for conspiracy to violate Burton's constitutional rights.  The sole claim in the First Amended Complaint asserted against Green is that she conspired with other defendants in the action to violate Plaintiff's civil and constitutional rights in violation of § 1983.  (*See* Compl. ¶¶ 190-94.)  To establish a § 1983 conspiracy

claim, a plaintiff must establish three elements:  "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."  *Ciambriello v. County of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002).  The Second Circuit has recognized that "'conspiracies are by their very nature secretive operations,' and may have to be proven by circumstantial … evidence."  *Pangburn v. Culbertsoni*, 200 F.3d 65, 72 (2d Cir. 1999) (quoting *Rounseville v. Zahl*, 13 F.3d 625, 632 (2d Cir. 1994).

The well-plead allegations of the First Amended Complaint firmly establish Green's participation in a conspiracy to violate Burton's constitutional rights.  Green entered the conspiracy in the wake of the grand jury indictment against Burton and the arrest of Emanuel Green following his being found in possession of the car belonging to Burton's mother.  Seeking favorable treatment and leniency, on or about January 11, 1989, at the Mount Vernon, New York police department station, Green (i.e., a private party) agreed with Emanuel Green and NYPD detectives (i.e., state actors) to cooperate (i.e., act in concert) with the detectives by adopting a false narrative implicating Burton in the crime for which he was innocent (i.e., a constitutional injury).  (*See* Compl. ¶¶ 95-111.)  Green committed the overt acts of signing and providing "false statements to save the case detectives had falsely built against [Burton] and prevent disclosure of their misconduct in coercing [Burton]'s false 'confession.'"  (*Id.* ¶ 109.)  As a result of Green's participation in the conspiracy, Burton was wrongfully convicted for the murder of his own mother, spent almost twenty years confined in prison and eight years on parole, and was subject to physical, psychological, and emotional trauma that accompanied the loss of freedom.  (*Id.* ¶¶ 168-70.)

With liability having been established, the Court turns to evaluating damages.

## DAMAGES

Earlier in this case, Burton demanded $31,500,000 to settle his claims.  In order to avoid prolonged and contentious litigation, Burton compromised with the New York City defendants for a settlement of $11,000,000.  Burton now seeks to hold Green, the lone remaining defendant, accountable for $19,000,000.[5]  (Arena Decl. ¶¶ 31-32.)

## A.     Principles For Determining Damages In Wrongful Conviction Cases

The Second Circuit has recognized two categories of actual damages stemming from a claim of wrongful imprisonment.  *Kerman v. City of New York*, 374 F.3d 93 (2d Cir. 2004).   One type of damages, deemed "special" – is associated with proof of pain, physical injury, mental suffering, humiliation, psychological deterioration, and associated medical expense. *Id*. at 122-23, 125; *Peacock v. City of Rochester*, No. 13-CV-6046, 2016 WL 4150445, at *2 (W.D.N.Y. Aug. 5, 2016) ("Compensatory damages in Section 1983 cases may include not only out-of-pocket loss and other monetary harms, but also such injuries as impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering") (internal quotation marks and citations omitted).  The second category of actual damage – deemed "general" – relates to the harm inherent in a loss of liberty.  *Kerman*, 374 F.2d at 125 ("[D]amages recoverable for loss of liberty for the period spent in a wrongful confinement are separable from damages recoverable for such injuries as physical harm, embarrassment, or emotional suffering....").  Damages for loss of liberty compensate an individual's "denial of free movement and the violation done

---

[5] Emanuel Green, the other non-settling defendant, is deceased.

to [an individual's] dignity as a result of the unlawful detention."[6]  *Gardner v. Federated Department Stores. Inc.*, 907 F.2d 1348, 1353 (2d Cir. 1990).

In reviewing jury and bench damages awards, the Court of Appeals assesses whether the amount "is so high as to shock the judicial conscience and constitute a denial of justice"; or, under the New York State standard, whether the award "deviates materially from what would be reasonable compensation."  *Restivo v. Hessemann*, 846 F.3d 547, 587 (2d Cir. 2017).   Determining dollar amounts for pain and suffering in a wrongful conviction case "is an inherently subjective determination," *Newton v. City of New York*, 171 F. Supp.3d 156, 176 (S.D.N.Y. 2016), that requires "assign[ing] values to the intangible and invaluable."  *Limone v. United States*, 497 F. Supp.2d 143, 243 (D. Mass. 2007), *aff'd*, 579 F.3d 79 (1st Cir. 2009).   Accordingly, in determining compensatory damages for wrongful conviction, courts consider whether the plaintiff's award falls within the reasonable range of awards from comparable cases.  *See Restivo*, 846 F.3d at 587; *Newton*, 171 F. Supp.3d at 173-77.  Doing so provides "perspective and … an indication of how society value[s] these harms."  *Limone*, 497 F. Supp.2d at 243.   The Court, however, "need not average the high and low awards"; instead, the Court "focus[es] … on whether the verdict lies within the reasonable range."  *Zeno v. Pine Plains Central*

---

[6] As one court eloquently put it, "We are asked to determine the value of the very things we take for granted; the very things we hold dear; the longings, hopes and aspirations. In short, the very essence for this individual's existence. It is as if a man's life has been terminated at one point and then resurrected later; yet with all the intervening traumas, dangers and injuries that will endure, linger and become a permanent part of his life. It is within this set of circumstances that this Court must award damages; stating again that the liberty one so cherishes is absolute and the loss of it a tragedy of incalculable value." *Baba-Ali v. State of New York*, 24 Misc.3d 576, 589-90, 878 N.Y.S.2d 555, 589 (Ct. Cl. 2009) (quoting *Ferrer v State of New York*, Claim No. 74308, filed June 13, 1990), *aff'd in part*, 76 A.D.3d 94, 907 N.Y.S.2d 432, *aff'd as modified*, 19 N.Y.3d 627, 951 N.Y.S.2d 94 (2012).

*School District*, 702 F.3d 655, 671 (2d Cir. 2012).

The amount of damages, even for claimants that have been incarcerated for similar periods of time, may vary depending on each claimant's individual circumstances and the course of his imprisonment.  The Court thus "must consider other verdicts in the context of all circumstances in the case at issue."  *Newton*, 171 F. Supp.3d at 177.  Among the many circumstances courts have considered are the stigma attached to the type of conviction, whether the individual was held in a juvenile or adult facility, whether the individual previously was incarcerated, the presence or absence of a significant criminal history prior to the unjust conviction, whether the plaintiff sustained physical abuse while incarcerated, the extent to which the plaintiff claims future or only past pain and suffering, and whether the alleged conduct of the defendants was caused by negligent acts or omissions or intentionally.  *See id.* at 175-76 (comparing case before the court with damages awards in comparable cases, emphasizing similarities and differences based on age of plaintiff at time of conviction, plaintiff's criminal history, extent of physical abuse while in prison, plaintiff's seeking compensation only for past pain and suffering, and reason for wrongful conviction).

## B.    Awards In Comparable Cases

The damages Burton seeks from Green equate to roughly $1,000,000 per year of incarceration.  An award in that amount is well-supported by awards in comparable cases.

In *Restivo*, two men were wrongfully convicted for the rape and murder of a 16-year-old girl.  They spent 18 years in prison.  The jury awarded $18 million to each plaintiff, the equivalent of one million dollars per year of wrongful incarceration.  On appeal, the Second Circuit had no hesitation in affirming the district court's awarding that amount:

"The district court … plainly did not abuse its discretion in holding that the amount awarded, $1 million per year of wrongful incarceration per plaintiff, neither shocks the conscience nor materially deviates from reasonable compensation.  Indeed the jury award is in line with other approved awards in wrongful conviction cases."  846 F.3d at 588.

In *Newton*, the plaintiff was convicted on two independent sexual assault felonies. One of the verdicts was overturned after locating and analyzing a rape kit that the defendants previously could not locate due to negligence, not purposeful destruction of evidence.  The plaintiff served ten years in prison for the lawful conviction, followed by twelve years for the wrongful conviction.  The sole witness on damages was the plaintiff, and he sought compensation only for past, not future, pain and suffering.  171 F. Supp. at 172-73.   The jury awarded the plaintiff $1.5 million for each year of wrongful incarceration.  On the defendants' motion for remittitur, the Court surveyed other wrongful incarceration cases.  In light of the facts compared to other cases, the Court determined that $1.5 million was excessive and ordered remittitur to $1 million per year of wrongful incarceration.  *Id.* at 173-77.

In reaching that decision, the court distinguished cases cited by the plaintiff where courts had awarded higher amounts.  *See, e.g.*, *Jimenez v. City of Chicago*, 732 F.3d 710 (7th Cir. 2013) (awarding approximately $1.5 million per year where plaintiff was wrongfully convicted at age of 15 and had no prior criminal conviction "during which he might have acclimated to prison life"); *White v. McKinley*, 605 F.3d 525 (8th Cir. 2010) (awarding approximately $2.5 million per year for five-and-a-half years where plaintiff was falsely convicted of molesting his daughter and had been physically abused while in prison); *Dominguez v. Hendley* 545 F.3d 585 (7th Cir. 2008) (awarding approximately

$2.5 million per year for four years of wrongful incarceration for sexual assault where plaintiff was 15 at time of conviction and had no prior criminal record);

In particular, the *Newton* court noted that unlike those cases awarding in excess of one million dollars, plaintiff was incarcerated as an adult, not a juvenile; that his wrongful incarceration followed ten years of lawful incarceration for a similar felony; that defendants had acted negligently not egregiously; that plaintiff sought compensation for only past, not future, pain and suffering; that plaintiff served as the sole witness on damages; and plaintiff testified that he suffered no physical injury or abuse while in prison. 171 F. Supp.3d at 177.   Here, Burton was tried as an adult for a murder allegedly committed when he was a juvenile; he had no prior criminal record or period of incarceration; Green acted egregiously; Burton seeks compensation for both past and future damage; Burton's claim for pecuniary harm is supported by expert testimony; and Burton was physically abused during part of his incarceration.   If one million dollars per year was apt in *Newton*, it is more than reasonable in the instant case where each of those distinguishing factors weighs in favor of a substantial award of damages.

Other jurisdictions have generally followed suit and arrived at similar results.   For example, in *Limone v. United States*, where two former prisoners' murder convictions were overturned, the court awarded damages for wrongful imprisonment at a rate of one million dollars per year.   497 F. Supp. 2d at 250-51 (D. Mass. 2007).   The court noted that "both juries and courts sitting without juries have found that wrongfully incarcerated plaintiffs were entitled to compensation of at least $1 million per year of imprisonment."[7]

---

[7] Although affirming the trial court's damages award, the First Circuit commented that "[w]ere we sitting as trial judges, none of us would have employed that same

20

*Id.* at 243 (collecting cases); *see also Smith v. City of Oakland*, 538 F. Supp.2d 1217, 1242-43 (N.D. Cal. 2008) (reiterating *Limone*'s observation that "a number of verdicts of approximately $1 million per year have been awarded in cases involving periods of wrongful incarceration which span a significant amount of time" and remitting $5 million emotional distress damages award to $3 million for four-and-a-half months wrongful imprisonment), *aff'd*, 379 F. App'x 647 (9th Cir. 2010).

An award of one million dollars to Burton for each year of wrongful imprisonment is fully supported by other cases.  Indeed, it is a conservative figure given the particulars of Burton's case.

## C.   Burton's Pecuniary Damages

Part of Burton's damages are comprised of wages and career opportunities lost as a result of his wrongful incarceration.  *See Peacock*, 2016 WL 4150445 at *4 (awarding wrongfully incarcerated plaintiff lost wages of $442,374).   As determined by expert Ostrofe, Burton's pecuniary loss includes earnings total $1,668,282.  (Ostrofe Report at 6.)  The Court has reviewed Ostrofe's curriculum vitae and report and accepts Ostrofe as an expert in determining Burton's lost earnings.  (*See* Ostrofe Report Ex. 2-3.)  The Court

---

methodology. The $1,000,000 per year baseline is extremely generous." *Limone*, 579 F.3d at 106.  To be sure, this Court does not mean to suggest that $1,000,000 is a "norm" or a baseline for every case of wrongful incarceration.  *See id.* at 107 (lamenting that "one district court recently … treated the $1,000,000 per year baseline as a floor for damages arising out of wrongful incarceration"). Rather, the Court's determination is made based on the specific circumstances of Burton's case as further discussed below.  It also bears noting that *Limone* was decided over 15 years ago.  Based on inflation, $1,000,000 in 2007 would be equivalent to $ 1,419,890.04 in 2022. https://www.minneapolisfed.org/about-us/monetary-policy/inflation-calculator (last visited Sept. 22, 2022).

also finds Ostrofe's calculations to be reliable based on her explanation of the methodologies employed.  (*See* Ostrofe Report at 3-4 and Ex. 1.)

The Court also finds the assumptions made by Ostrofe to be reasonable, reliable, and admissible pursuant to Fed. R. Ev. 702.  Ostrofe assumed, among other things, that, but for his wrongful incarceration, Burton would have attained a Bachelor's Degree and would have generated net earnings consistent with government employment statistics. (Ostrofe Report at 3-4, 6.)  The record supports Ostrofe's assumptions about Burton's future earnings capacity.  While incarcerated, Burton pursued and received licenses as an asbestos abatement handler and a food handler, as well as various plumbing certificates.  (Burton EBT at 202.)  Burton also received his GED immediately once he was out on bail.  (Burton EBT at 202.)

Burton's pursuit of education and work-related certificates and licenses while wrongfully incarcerated demonstrates the rigor with which Mr. Burton would have pursued higher education and employment but for his wrongful conviction and establishes the likelihood of his having done so but for his wrongful incarceration.  Indeed, since his release from prison in September 2009, Burton has consistently worked.  Immediately after his release, Burton worked for his cousin by answering phones and assisting with videography; he then drove a forklift at a medical waste facility; he then entered the elevator industry where he remained consistently for the next eight years.  (Burton EBT 205-06.)  The Court thus finds that that there is a factual basis for the assumptions made and opinions rendered by Ostrofe, and that Burton suffered pecuniary loss in the amount of $1,668,282.  *See Peacock*, 2016 WL 4150445 at *4 (finding economist's opinion of plaintiff's lost wage to be generally well-supported, reasonable, and unrebutted).

**D.     Burton's Nonpecuniary Damages**

The loss of liberty and loss of a normal life Mr. Burton experienced while wrongfully incarcerated, and the lasting impact of his wrongful incarceration, further support a damages award of $19,000,000 from Green.

"Liberty is absolute and the loss of it irreplaceable." *Baba-Ali v. State,* 24 Misc.3d 576,  588, 878 N.Y.S.2d 555, 564 (Ct. Cl. 2009) (internal quotation marks and citation omitted).   "Damages attributable to loss of liberty include damages for the loss of the fundamental right to be free, lost opportunities to engage in everyday activities while confined, and for the mental anguish that accompanies the loss of liberty." *Peacock,* 2016 WL 4150445 at *2 (quoting *Sanabria v. State of New York*, 29 Misc.3d 988, 994, 908 N.Y.S.2d 527, 532 (N.Y. Ct. Cl. 2010)).   "The mental anguish that accompanies the loss of liberty … suffered by an [individual] while he is in prison encompasses his 'discomfort, fear, lack of privacy and degradation.'" *Id.* (quoting *Baba-Ali*, 24 Misc.3d at 582, 878 N.Y.S. 2d at 560).   Burton's loss of liberty was immense.   He was wrongfully arrested and imprisoned as a teenager.   He languished in prison for more than 19 years, unable to engage in everyday freedoms.   He labored under additional restrictions while on probation for another eight years.

Apart from loss of liberty, Burton was deprived of a normal life.   His wrongful conviction and incarceration tore his life apart at a time when he was most vulnerable. Burton was forced to spend some of the most formative years of his adult life in prison, thus depriving him of the life he would have otherwise built for himself.   He was deprived of the opportunity to fully grieve the loss of his mother in a supportive environment.   He was deprived of irreplaceable time with his father who, after fighting for Burton's

innocence by paying for counsel and pledging his house for Burton's bail, lost his life to Alzheimer's while Mr. Burton "watched it from a cage."  (Burton EBT at 227.)  And following his lengthy incarceration, Burton was unable to sustain his marriage.

While in prison, Burton was ostracized by other inmates and physically assaulted. He suffered from the extreme mental anguish of being regarded as someone who murdered his own mother.  His anguish was exacerbated by the heinous nature of the crime, murdering his mother to buy crack cocaine.  And, all the while, he was innocent. *See Peacock*, 2016 WL 4150445 at *2 ("As courts have noted, 'the mental distress of one unjustly imprisoned is obviously different and greater than one justly in jail'") (quoting *Carter v. State*, 139 Misc. 2d 423, 430, 528 N.Y.S.2d 292, 297, (Ct. Cl. 1988), *aff'd*, 546 N.Y.S.2d 648 (2d Dep't 1989)).

Burton could have fared worse.  He did not experience any serious physical injuries while imprisoned (despite being physically abused), did not seek or receive mental health counseling, and has not had trouble sleeping since being out. Nonetheless, there can be no legitimate dispute that Burton's nearly 20 years of wrongful incarceration and near-decade on parole, the stigma attached to the crime for which he was wrongfully convicted, and the anguish of having been wrongfully convicted for murdering his own mother have led to immeasurable harm.  Burton deserves to be properly compensated for having his life left in pieces, many of which he "can never put back together."  (Burton EBT at 229.)  One million dollars for each year of wrongful incarceration is not too much to ask and not too much to award but instead is entirely reasonable.  The horror that Burton has had to endure as a result of Green's conduct shocks the conscience; a damages award of $19 million in favor of

Burton does not.

## E.    Setoff

Burton already has received $11 million in his settlement with the New York City defendants.  The question arises whether the award of damages against Green should be offset (that is, reduced by) the settlement amount.  *See, e.g.*, *Restivo*, 846 F.3d at 581-87 (analyzing whether damages for wrongful conviction should be offset by amount of settlement reached with New York State); *Peacock*, 2016 WL 4150445 at *4-5 (analyzing whether damages for wrongful conviction should be offset by amount awarded by statute in New York State Court of Claims).  Burton argues that offset should not be applied here. The Court agrees.

When a plaintiff receives a settlement from one defendant, a non-settling defendant is generally entitled to have any judgment the plaintiff secures against them offset by the settlement amount "as long as both the settlement and judgment represent common damages."  *Singer v. Olympia Brewing Co.*, 878 F.2d 596, 600 (2d Cir. 1989). However, "[t]he burden of establishing the extent to which a plaintiff's recovery from the non-settling defendant is duplicative of the plaintiff's recovery from the settling defendant – and the consequences for failing to satisfy that burden – fall squarely on the non-settling defendant."  *Godfrey v. Soto*, No. 06-CV-0428, 2007 WL 2693652, at *7 (E.D.N.Y. July 9, 2007).  By virtue of failing to participate in this litigation, Green cannot satisfy her burden and should not be rewarded with a setoff of the settlement paid by the settling Defendants. *See id.* (rejecting setoff for defaulting defendant and observing that "[t]he few New York courts confronted with a nonsettling defendant who has defaulted have decided that the windfall should not accrue to the benefit of the party who has refused to participate in

litigation"); *State Farm Mutual Auto Insurance Co. v. Grafman*, 968 F. Supp.2d 480, 483 (E.D.N.Y. 2013) ("In choosing not to participate in the litigation, a defaulting party eschews the opportunity to carry this burden, and therefore does not demonstrate its entitlement to, or deserve the benefit of, a set-off").[8,9] The Court therefore will not setoff the damages against Green by the amount Burton received in settling with the New York City defendants.

## PUNITIVE DAMAGES

In addition to the $19 million compensatory damages award, Burton also requests an award of punitive damages.

Under Section 1983, punitive damages are available "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S. Ct. 1625, 1640 (1983). "By contrast [to compensatory damages], punitive damages serve a broader function; they are aimed at deterrence and retribution." *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 416, 123 S. Ct. 1513,

---

[8] Burton offers a number of other reasons for why Green should not benefit from setoff, including that Burton has not consented to setoff; Burton's damages from Green do not flow from the same injury caused by the New York City defendants; and no fact-finder has made any determination of the various defendants' proportionate default. The Court need not and does not address the merits of those additional arguments.

[9] As noted at the end of this opinion, it appears doubtful that Burton will be able to recover the entirety, if any, of his judgment against Green – she has not appeared and, based on the factual history of this case, there is little reason, absent a dramatic reversal of fortune for Green, to believe that Green would have sufficient assets to satisfy the judgment. In any event, in the unlikely event that Burton is able to collect fully on his judgment against Green, he will have received, accounting for the settlement with the New York City defendants, a total of thirty million dollars. That sum represents approximately $1.5 million for each year of incarceration. For all the reasons set forth above, that number is reasonable and does not shock the conscience in the specific circumstances of this case.

1519 (2003).  An award of punitive damages is discretionary.  *See Wade*, 461 U.S. at 52, 54, 103 S. Ct. at 1638, 1639 ("Punitive damages are awarded in the jury's discretion" and "are never awarded as of right, no matter how egregious the defendant's conduct").

There is no formula or objective measure by which to arrive at a particular amount of punitive damages.  *Payne v. Jones*, 711 F.3d 85, 93 (2d Cir. 2013).  The Supreme Court, however, has "identified three 'guideposts' for determining whether a punitive damages award is excessive: 1) the degree of reprehensibility; 2) the disparity between the harm or potential harm and the punitive damages award; and 3) the difference between the remedy and the civil penalties authorized or imposed in comparable cases."[10] *DiSorbo v. Hoy*, 343 F.3d 172, 186 (2d Cir. 2003) (citing *BMW of North America v. Gore*, 517 U.S. 559, 574-75, 116 S. Ct. 1598-99 (1996)).  The reprehensibility analysis is "the most important indicium of the reasonableness of a punitive damages award."  *Gore*, 517 U.S. at 575, 116 S. Ct. at 1599.

Burton requests that the Court assess punitive damages against Green, particularly in light of her "evil motive or intent" or "reckless or callous indifference" to his rights.  There is no doubt that, as alleged in the Complaint, Green's conduct is reprehensible.  Green was at the scene, if not involved, in the murder of Burton's mother.  (Compl. ¶ 133.)  Green provided false information to police investigators multiple times.  (Compl. ¶¶ 51-53, 133, 158.) Following the arrest of her husband Emanuel, who was found

---

[10] In addition, a court is required to consider the defendant's financial circumstances in determining an award of punitive damages.  *Patterson v. Balsamico*, 440 F.3d 104, 121 (2d Cir. 2006).  By defaulting, however, Green "has surrendered the opportunity to demonstrate that h[er] financial circumstances should constrain the amount of any such award."  *Antoine v. Brooklyn Maids 26, Inc.*, 489 F.Supp.3d 68, 102 (E.D.N.Y. 2020) (citing *Mathie v. Fries*, 121 F.3d 808, 816 (2d Cir. 1997)).

in possession of Ms. Burton's stolen car, Green sought to protect herself and Emanuel by fabricating a story, together with detectives, to keep the 16-year-old Burton in custody and prosecuted for the murder of his mother.   (Compl. ¶¶ 95-111.)   Framing an innocent teenager for the murder of his mother is unquestionably reprehensible.

The Court, however, is not in a position to recommend an award of punitive damages.   Although punitive damages may be awarded as part of a default judgment, *see Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504, 509 (2d Cir. 1991) (affirming default judgment awarding punitive damages), they may not be awarded without evidentiary proof.   Allegations of the Complaint, which are accepted as true for purposes of liability, do not suffice for establishing the amount of punitive damages.   *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974) (holding that punitive damages could not be recovered on default judgment without an evidentiary hearing and explaining "the quantum of damages remains to be established by proof unless the amount is liquidated or susceptible of mathematical computation. … Punitive damages are clearly not liquidated or computable"); *Henry v. Oluwole*, No. 13-CV-826, 2021 WL 4441934, at *12 (D. Conn. Sept. 28, 2021) ("in order to demonstrate that she is entitled to punitive damages, Henry may not merely rely on the allegations deemed admitted by virtue of the default judgment"), *appeal filed* Sept. 30, 2021 (2d Cir.); *Robertson v. Doe*, No. 05-CV-7046, 2009 WL 10676484, at *11 (S.D.N.Y. Dec. 17, 2009) ("in the context of default judgment, punitive damages cannot be awarded merely upon review of the pleadings and must be established by further evidence and testimony"), *R. & R. adopted*, 2010 WL 11527317 (S.D.N.Y. May 11, 2010), *aff'd sub nom.*, *Robertson v. Dowbenko*, 443 F. App'x 659 (2d Cir. 2011).

To be sure, the materials submitted by Burton for determination of damages include Burton's declaration, his deposition testimony, his attorney's declaration, and an expert evaluation of his pecuniary damages.  But they do not contain admissible evidence regarding Defendant Green's conduct and mindset.  The only fact citations provided by Burton to support awarding punitive damages against Green are to the Complaint.  (*See* Supp. Damages Brief at 22.[11])  The Court has given Burton ample opportunity to submit support for his application (*see* Dkts. 93, 95, 109) and extended the timeframe for doing so several times (*see* Dkts. 98, 101, 104).  Moreover, Burton has urged the Court to resolve the inquest based on the written submissions without holding an evidentiary hearing.  (*See* Dkt. 111 ("unless the Court orders otherwise, Plaintiff intends to rest on the default papers submitted to date").)

Burton also has not suggested any particular amount of punitive damages that should be awarded.  Nor has Burton cited any cases awarding punitive damages to provide as a point of comparison under the third "guidepost," except for a single unpublished out-of-Circuit decision.  *See McCollum v. Robeson County*, No. 15-CV-00451, Dkt. No. 429 (E.D.N.C. May 14, 2021) (award of $13,000,000 in punitive damages for 31 years of incarceration based on false confession).  The principal New York wrongful incarceration cases cited in connection with compensatory damages – *Restivo*, *Newton*, and *Peacock* – provide little guidance, as they do not appear to have included a punitive

---

[11] "Supp. Damages Brief" refers to Plaintiff Huwe Burton's Supplemental Brief In Support Of Damages" at Dkt. 106.

damages component.[12]

Given the evidentiary gap to support a determination of punitive damages, and in light of the very substantial compensatory damages award, the Court recommends that no punitive damages be awarded.

## POST-JUDGMENT INTEREST

Finally, Burton asks for and is entitled to post-judgment interest pursuant to 28 U.S.C. § 1961, which provides for imposition of post-judgment interest on "any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a) . As the Supreme Court has noted, "the purpose of post-judgment interest is to compensate the successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of damage and the payment by the defendant." *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 828, 110 S. Ct. 1570, 1572 (1990) (citation omitted). Post-judgment interest is calculated from the date of entry of judgment to the date the defendant pays the judgment at a rate equal to the weekly average one-year constant maturity Treasury yield, compounded annually. 28 U.S.C. §§ 1961(a), (b).

The Court recommends that post-judgment interest be awarded to Burton consistent with the statute. *See Augustin v. Jablonsky*, 819 F. Supp.2d 153, 180 (E.D.N.Y. 2011) (in § 1983 case for illegal strip searches, court awarded "post-judgment

---

[12] Cases against New York State or its municipalities, as distinct from their individual actors, also are of no assistance as neither the State nor its municipalities may be held liable for punitive damages. *Sharapata v. Town of Islip*, 56 N.Y.2d 332, 334, 452 N.Y.S.2d 347, 348 (N.Y. 1982); *Canete v. Metropolitan Transportation Authority*, No. 17 Civ. 3961, 2018 WL 4538897, *9 (S.D.N.Y. Sept. 20, 2018).

interest at a rate to be calculated pursuant to the explicit terms of Section 1961, running from the date of the entry of judgment").

## CONCLUSION

It is not lost on the Court that the likelihood of Burton being able to enforce and collect on any judgment against Green is slim to none.  The entry of default judgment against Green likely is symbolic at best.  Regardless, Burton deserves justice, and recognition of the extent of harm caused by Green and others who contributed to Burton's wrongful conviction and incarceration is the least that can be done.  For the foregoing reasons, I recommend that the Court enter default judgment in favor of Plaintiff, and award Plaintiff compensatory damages in the amount of $19 million and post-judgment interest pursuant to 28 U.S.C. § 1961.

## SERVICE ON DEFENDANT GREEN

Plaintiff shall serve Defendant Green with a copy of this Report and Recommendation within three business days of its entry and shall file proof of service within four business days after service.  Plaintiff shall use any method of service on Green previously approved in this action.

## OBJECTIONS AND RIGHT TO APPEAL

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days to file written objections to this Report And Recommendation.  Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the Chambers of the Honorable Analisa Torres, United States Courthouse, 500 Pearl Street, New York, New York 10007, and to the Chambers of the undersigned, United States Courthouse, 500 Pearl Street, New York,

New York 10007.  **Failure to file timely objections will result in a waiver of objections and will preclude appellate review.**

Respectfully submitted,

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: September 26, 2022
      New York, New York

Copies transmitted this date to all counsel of record.